1

1     IN THE UNITED STATES DISTRICT COURT
2       FOR THE SOUTHERN DISTRICT OF GEORGIA
             STATESBORO DIVISION

3

4

5  UNITED STATES OF AMERICA,      :
                                  :
6     v.                          :
                                  :   CASE NUMBER 3:23-CR-00005
7  AUSTON COLE WAGNER,            :
                                  :
8        Defendant.               :
   _____

9

10

11

12

13                  MOTIONS HEARING

14      BEFORE THE HONORABLE BRIAN K. EPPS
           United States Magistrate Judge

15
           United States Courthouse
16             52 North Main Street
             Statesboro, Georgia
17              May 7, 2024

18

19

20

21

22  _____

23  COURT REPORTER:  Victoria L. Root, CCR
                     United States Court Reporter
24                   Post Office Box 312
                     Meldrim, Georgia  31318
25                   (912) 650-4066

2

1                          A P P E A R A N C E S

2

3    FOR THE GOVERNMENT:

4            JASON W. BLANCHARD, Esquire
             Assistant United States Attorney
5            600 James Brown Boulevard, Suite 200
             Augusta, Georgia  30901
6            (706) 724-7728
             jason.blanchard@usdoj.gov

7

8    FOR THE DEFENDANT:

9            TINA E. MADDOX, Esquire
10           Law Office of Tina E. Maddox, LLC
             205 Smith Street
11           Vidalia, Georgia  30474
             (912) 537-3025
12           tinam13@bellsouth.net

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2                                                    Page

3    PRELIMINARIES. . . . . . . . . . . . . . . . . .     5

4

     GOVERNMENT'S WITNESSES:

5

        1. HILLARY NIELSEN

6            Direct Examination by Mr. Blanchard . . . . .   12
             Cross-Examination by Ms. Maddox . . . . . . .   43

7            Redirect Examination by Mr. Blanchard . . . .   56

8

     CERTIFICATE OF REPORTER. . . . . . . . . . . . . .   63

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                          E X H I B I T   I N D E X

2

3      GOVERNMENT'S
       EXHIBIT NUMBER              IDENTIFIED              ADMITTED
4            1                         5                      6

5            2                         6                      6

6            3                         6                      6

7            4                         6                      –

8            5                         6                      –

9            6                         6                      –

10           7                         7                      7

11           8                         7                      7

12           9                         7                      7

13          10                         7                      7

14

15

16                              –   –   –

17

18

19      DEFENSE
        EXHIBIT NUMBER             IDENTIFIED              ADMITTED
20           3                         9                     10

21

22

23

24

25

5

1                     P R O C E E D I N G S

2                           -oOo-

3        (Call to order at 1:08 p.m.)

4            COURT CLERK:  The Court calls Case 3:23-CR-00005,

5    *United States of America v. Auston Cole Wagner*; Jason Blanchard

6    for the Government; Tina Maddox for the defendant; here for a

7    motions hearing.

8            THE COURT:  Good afternoon, everybody.

9            MR. BLANCHARD:  Good afternoon, Judge.

10           THE COURT:  All right.  Let's go through, before we

11   start, the exhibits to make sure that I have all those and

12   understand what we're presenting today.  Let's start with the

13   Government's exhibit list.

14           So the Government is submitting as Exhibit 1 the

15   interview with Mr. Wagner.

16           And is that the interview that took place in the van?

17           MR. BLANCHARD:  Yes, Your Honor.

18           THE COURT:  Okay.  And so all the letters under

19   that -- 1-A, 1-B, 1-C -- that's just clips from the overall

20   video itself?

21           MR. BLANCHARD:  That's correct.  All those clips, A

22   through P, are just clips from Exhibit 1 itself.

23           THE COURT:  Okay.  And, Ms. Maddox, do you have any

24   objection to admission of that video of the van interview as

25   Exhibit 1?

1         MS. MADDOX:  No, Your Honor.

2         THE COURT:  Okay.  And what's Exhibit 2?

3         MR. BLANCHARD:  Exhibit 2 is also a -- sort of a 3-

4    to 4-minute clip in the van at the end of the drive, and so

5    it's just the continuation of the van --

6         THE COURT:  Okay.

7         MR. BLANCHARD:  -- interview.

8         THE COURT:  What about, Ms. Maddox, Exhibit 2?  Do

9    you have any objection to it being admitted?

10         MS. MADDOX:  No, Your Honor.

11         THE COURT:  Okay.  What about the rest of these?

12   Does the Government plan on submitting the remainder?

13         MR. BLANCHARD:  Your Honor, we're going to submit

14   Exhibit 3, which is the consent to search form that Defendant

15   signed in the van during the interview that's referenced in

16   Exhibit 1.

17         The Government does not intend to introduce

18   Exhibits 4, 5, and 6.  And so we would like to put on the

19   record notice that the Government does not intend to use

20   Exhibits 4, 5, and 6 at its case in chief at trial in this

21   case.  That is the polygraph interview and the interview made

22   with Special Agent Neilsen after the polygraph that occurs

23   at the sheriff's office.

24         And so our contention is that the motion to suppress

25   on those statements is moot.  And I've discussed this with

7

1   Ms. Maddox prior to the hearing today.  I think we have an

2   agreement on that.

3           MS. MADDOX:  We do, just what he stated.  Those

4   issues are moot, and those items will not be presented at time

5   of trial, so, as such, we don't need a ruling on that.

6           THE COURT:  Okay.  So the polygraph -- so, basically,

7   the only statements, then, the Government will seek to admit at

8   trial will be the statements made in the van during the initial

9   interview while the search was being conducted of the home.

10  The Government will not admit the -- evidence of any statements

11  made during the polygraph examination and then the follow-up

12  interview by Agent Nielsen after the polygraph examination

13  ended.

14          MR. BLANCHARD:  That's correct, with one caveat.

15  And it's -- Exhibits 7 through 10 are body camera video that

16  occurred before Defendant Wagner gets into the van.  And so

17  there's an interaction that occurs prior to the interview in

18  the van that we are submitting into evidence in the case and

19  do believe is appropriate for use at trial.

20          THE COURT:  Okay.  Ms. Maddox, what about Exhibits 7,

21  8, 9 and 10?  Do you have any objection to those being

22  admitted?

23          MS. MADDOX:  We don't.

24          And, also, I would like to have Mr. Blanchard recall

25  that we agreed that any reference to a polygraph will be

8

1   redacted out of the interview in the van should the Court find

2   that it is admissible at trial.

3           MR. BLANCHARD:  And that's an accurate

4   representation, Your Honor.  We will redact any reference to

5   the polygraph examination from Exhibit 1 at time of trial.

6           THE COURT:  Okay.  I'm thinking -- trying to think of

7   the best way to memorialize the agreement y'all just mentioned.

8   I could put it in an order myself, or y'all could prepare and

9   file a stipulation.  I like the stipulation idea better

10  because, that way, I don't mess it up.

11          MR. BLANCHARD:  I'd be happy to prepare a stipulation

12  and circulate it with Ms. Maddox and then submit it to the

13  Court.

14          THE COURT:  Okay.

15          MS. MADDOX:  That's exactly --

16          THE COURT:  Okay.  And y'all can just -- as long as

17  y'all agree on the language and that it takes care of the

18  polygraph and second Nielsen interview issues fully, as long as

19  it's to your satisfaction that those issues are taken care of

20  by the stipulation, the best thing to do, instead of submitting

21  it to me for some kind of approval, is just to put it on the

22  record in the case, just to file it.

23          MR. BLANCHARD:  We'll do that, Your Honor.

24          THE COURT:  Is that good?  Okay.

25          MR. BLANCHARD:  Yes, Your Honor.

9

1          THE COURT:  All right.  Now, let's move to the

2    defense exhibit list.

3          Do you have any exhibits that aren't already in the

4    Government's exhibit list that you'd like to have admitted,

5    Ms. Maddox?

6          MS. MADDOX:  We will admit, at the conclusion of the

7    hearing, the unofficial transcript, which is more demonstrative

8    in nature than anything else.  Mr. Blanchard and I have agreed

9    that we can submit that after the hearing for the Court's

10   review whenever Your Honor goes to review all of this in detail

11   once the hearing is concluded.

12         THE COURT:  Okay.  And remind me what -- so I have

13   those two transcripts that were attached to Document 56 and

14   Document 57 on the record.  One is the polygraph, itself,

15   examination.  The other is -- it starts off "All units moving

16   in."  So that must have been the initial interview in the van

17   and the conversation that took place in the van.

18         So that that he just referred to --

19         MS. MADDOX:  "All units moving in" is the one that we

20   will be seeking to admit as an exhibit.

21         THE COURT:  Okay.  And from your perspective,

22   Ms. Maddox, have you reviewed every line of this proposed

23   exhibit, and do you believe it accurately represents the

24   conversations that are recorded on the video?

25         MS. MADDOX:  I have more than once, and I do believe

1    it's an accurate representation.

2            THE COURT:  Okay.

3            MS. MADDOX:  However, it's not a certified

4    transcript.  And we do, you know, agree that it's not a

5    certified transcript.

6            THE COURT:  Okay.  Well, as long as the parties

7    stipulate to the accuracy of it, then I'm okay -- I'm safe to

8    consider it, I believe.

9            MR. BLANCHARD:  Your Honor, the discussion we had

10   was that it's not a certified transcript; it's prepared by an

11   internet service; and that the best evidence is the video

12   itself.  But this is a helpful tool for the Court to review.  I

13   have not gone through each and every line of it to know whether

14   it's accurate, and it's not certified by a court reporter.

15           So I have no problem with admitting the exhibit as a

16   helpful tool to the Court, but I don't believe it's the -- it's

17   technically the best evidence of the conversation that occurred

18   and that the best evidence itself would be Exhibits 1, 7, 8, 9,

19   and 10.

20           THE COURT:  Okay.  Well, so -- this is Exhibit 3 that

21   we're talking about of your list, Ms. Maddox?

22           MS. MADDOX:  Yes, Your Honor.

23           THE COURT:  This -- then -- so you have no objection

24   to it being admitted, Mr. Blanchard; is that right?

25           MR. BLANCHARD:  No objection, Your Honor.

11

1      THE COURT:  Okay.  And, you know, to the extent that
2  I issue any kind of R&R or order that includes where I rely on
3  this transcript and you believe that it's not an accurate
4  reflection, the burden will be on the Government to point that
5  out.
6      MR. BLANCHARD:  Yes, Your Honor.
7      THE COURT:  Okay.
8      MR. BLANCHARD:  We'll do that.
9      THE COURT:  Okay.  Does that take care of all the
10  exhibits?
11      MS. MADDOX:  Yes, sir.
12      THE COURT:  Because Defense Exhibits 1 through 2 will
13  not be admitted; is that right?
14      MS. MADDOX:  That's right.  We are going to default
15  to the usage of the Government's . . .
16      THE COURT:  Excellent.  All right.  So we've narrowed
17  this down to admissibility of statements that Defendant made
18  preceding and during the search of his home while being
19  interviewed by Agent Nielsen in the van and right before that
20  interview occurring, as reflected in the transcript that we've
21  now admitted into evidence as Defense Exhibit 3.
22      Is that right, Mr. Blanchard?
23      MR. BLANCHARD:  That's correct.
24      THE COURT:  Ms. Maddox?
25      MS. MADDOX:  Yes, sir.

1          THE COURT:  All right.  Do y'all want to make any

2    opening statements before we begin with the Government's first

3    witness?

4          MR. BLANCHARD:  I'm okay waiving opening statements

5    and calling our witness, if that's acceptable to Ms. Maddox and

6    the Court.

7          MS. MADDOX:  I have no objection to that.

8          THE COURT:  All right.  You may proceed,

9    Mr. Blanchard.

10          MR. BLANCHARD:  All right.  At this time, we would

11    call Special Agent Hillary Nielsen.

12       (The witness, Hillary Nielsen, was sworn.)

13          COURT CLERK:  You may be seated.

14          Would you please state your full name for the record.

15          THE WITNESS:  Hillary Nielsen.

16          COURT CLERK:  And what agency are you with?

17          THE WITNESS:  Homeland Security Investigations.

18          COURT CLERK:  Thank you.

19                        HILLARY NIELSEN,

20    having been duly sworn, was examined and testified as follows:

21                      DIRECT EXAMINATION

22    BY MR. BLANCHARD:

23    Q.   Good afternoon, Agent Nielsen.

24    A.   Good afternoon.

25    Q.   You're a special agent with Homeland Security

13

1    Investigations; is that right?

2    A.    That's correct.

3    Q.    How long have you been employed by Homeland Security

4    Investigations?

5    A.    About 3 and a half years.

6    Q.    Okay.  I'm going to refer to Homeland Security as HSI.

7          Is that okay with you?

8    A.    Yes.

9    Q.    All right.  What types of cases do you investigate in your

10   role at HSI?

11   A.    Primarily, I investigate child exploitation cases.

12   Q.    Were you involved in the investigation of the defendant in

13   this case, Auston Cole Wagner?

14   A.    Yes, I was.

15   Q.    And during the investigation, did you obtain a federal

16   search warrant for the premises known as 261 Sophia Drive in

17   Eastman, Georgia?

18   A.    Yes, I did.

19   Q.    Did you also obtain a federal search warrant for a 2023

20   Dodge Challenger and the person of Auston Cole Wagner?

21   A.    Yes, I did.

22   Q.    And what did those warrants authorize you to search for?

23   A.    For electronic devices that could access the internet or

24   store data as well as records or information related to the

25   production, possession, distribution, or receipt of child

1    pornography.

2    Q.    Okay.  And when were those federal search warrants

3    executed in this case?

4    A.    May 9th of 2023.

5    Q.    Can you describe the operation plan for this search in

6    general.

7    A.    So since we had a search warrant for the premises as well

8    as the search warrant for a vehicle and the person of

9    Mr. Wagner, we kind of had had two teams for this operation, one to

10   handle the execution of the premises search warrant at the same

11   time as the execution of the person and vehicle search warrant.

12        So the plan was to make contact with Mr. Wagner while he

13   was in his vehicle approaching his residence, to serve the

14   search warrant on that vehicle as well as on Mr. Wagner's

15   person.  And then simultaneously, a team would be approaching

16   the residence to serve a search warrant there.  Anybody

17   identified during the execution of any of those search warrants

18   would then be given the opportunity to interview.

19   Q.    Okay.  And what was your role in the operation plan

20   specifically?

21   A.    I was the team lead for the operation as well as on the

22   interview team for Mr. Wagner.

23   Q.    Okay.  And how did you arrive at the search location that

24   morning?

25   A.    I drove my government vehicle.  And I had another

1    investigator with me from Dodge County.

2    Q.    Dodge County Sheriff's Department?

3    A.    That's correct.

4    Q.    Okay.  Was your vehicle a van that's issued to you by

5    Homeland Security?

6    A.    It is, yes.

7    Q.    All right.  Can you describe that van for the Court.

8    A.    It is a silver minivan.  It has police lights on the

9    inside, so not visible from the outside, but equipped with

10   lights and a siren that can be activated from the inside.  It

11   does not have a PA system.  It does not have a cage separating

12   the front seat from the back seat.

13       On the inside, it really looks like a regular minivan,

14   bucket seats in the back.  There are only two seats in that

15   back center row.  But it looks like a regular minivan, pretty

16   much, inside and out.

17   Q.    Okay.  That van, is it in any way marked as law

18   enforcement on the outside?

19   A.    No, it's not.

20   Q.    Does that van have video or audio equipment installed to

21   record conversations?

22   A.    No, it does not.

23   Q.    Okay.  Were you wearing a body camera at any point on the

24   day of the search?

25   A.    No, I was not.

1    Q.    And why not?

2    A.    My office is not issued body cameras.

3    Q.    Okay.  Were other law enforcement officers wearing a body

4    camera on the day of the search?

5    A.    Yes.  Officers from other agencies that had been issued

6    body cameras were wearing them that day.

7    Q.    Okay.  And why were they wearing body cameras?

8    A.    They were following their local policy.

9    Q.    Okay.  Their local agent -- agency policy; is that right?

10   A.    That's correct.

11   Q.    Okay.  Is it fair to say that you were captured on body

12   camera worn by other law enforcement officers on the day of the

13   search?

14   A.    Yes.

15            MR. BLANCHARD:  All right.  At this time, I'm going

16   to have my legal -- paralegal, Amy, queue up Clip 10.  I don't

17   know if we need to cut on the audio and video at this point or

18   not.

19            COURT CLERK:  It's on.

20            MR. BLANCHARD:  So at this point, I'm going to ask

21   Amy to queue up Clip 10 and go ahead and play that.

22        (Video playing at 1:20 p.m.)

23            MR. BLANCHARD:  I'm going to have Amy go ahead and

24   pause the video at this point.

25        (Video stopped at 1:21 p.m.)

1   BY MR. BLANCHARD:

2   Q.   Special Agent Nielsen, are you in this video?

3   A.   I am.

4   Q.   Can you identify yourself on the screen.

5   A.   I'm on the far right-hand side of the screen.

6   Q.   Okay.  Is this footage from a body camera worn by a local

7   deputy?

8   A.   It is.

9   Q.   And does this clip accurately reflect your first

10  interaction with Defendant Wagner on the morning that the

11  search warrant was executed?

12  A.   Yes, it does.

13  Q.   Okay.

14       MR. BLANCHARD:  Amy, if you wouldn't mind restarting

15  the clip.

16       (Video playing at 1:22 p.m.)

17       MR. BLANCHARD:  And, Amy, would you pause the clip

18  there for me.

19       (Video stopped at 1:22 p.m.)

20       MR. BLANCHARD:  I should have clarified this before

21  playing this, Your Honor.  This is -- this video clip,

22  Exhibit [sic] 10, is actually a compilation of three different

23  body cameras on the scene, and so you're getting different

24  angles from three different body cameras that are Exhibits 7,

25  8, and 9 sort of compiled together.

18

1   BY MR. BLANCHARD:

2   Q.   But as to the question, Agent Nielsen, what do you ask

3   Defendant Wagner initially here as you approached his vehicle?

4   A.   I say, "Do you want to step around back here with us for a

5   second?"

6   Q.   And how did he respond to that question?

7   A.   In response, he says, "Sure."

8   Q.   Okay.  What's the purpose of asking him if he would step

9   back to your van with you at that point?

10  A.   To execute the search warrant on his person and then give

11  him the opportunity to interview.

12  Q.   Okay.

13          MR. BLANCHARD:  Amy, would you restart the clip.

14      (Video playing at 1:23 p.m.)

15          MR. BLANCHARD:  And if you'll pause it right there,

16  Amy.

17      (Video stopped at 1:23 p.m.)

18  BY MR. BLANCHARD:

19  Q.   Special Agent Neilsen, you took Defendant Wagner by the

20  arm for 4 to 5 seconds there in that clip.

21      Did you see that?

22  A.   Yes.

23  Q.   And what was the purpose of you taking him by the arm

24  there?

25  A.   A couple of reasons.  So he was about to walk into the

19

1   roadway.  But where my vehicle was positioned is actually a few

2   car lengths back parked on the side of the road that you can

3   see us standing on now, so I was directing him out of the

4   roadway, back on the path to my vehicle.

5       I was also aware that there was the residence search

6   warrant team that was about to be caravaning down this roadway,

7   so the safest path for us to walk would have been on this

8   shoulder here and also away from the group of law enforcement

9   at the front of the vehicle that was just gathered, because

10  this was the path that the team was aware we'd be taking.

11  Q.   Okay.

12          MR. BLANCHARD:  Amy, if you'd restart the clip,

13  please.

14      (Video playing at 1:24 p.m.)

15          MR. BLANCHARD:  And, Amy, if you'd go ahead and just

16  pause the clip there for me, please.

17      (Video stopped at 1:25 p.m.)

18  BY MR. BLANCHARD:

19  Q.   Once you walk back to the van with Defendant Wagner here,

20  what happens?

21  A.   This is where the execution of the search warrant on his

22  person took place.

23  Q.   Okay.  And as we've got it paused, this illustrates where

24  you're actually executing the search warrant of the person of

25  Defendant Wagner; is that right?

20

1    A.    That's correct.

2    Q.    Okay.   What were the results of the search you performed

3    on the person of Defendant Wagner?

4    A.    He did not have any electronic devices in his possession.

5    He had some ID cards from his employment.

6    Q.    Okay.

7              MR. BLANCHARD:   Amy, would you restart the video.

8         (Video played from 1:25 p.m. to 1:27 p.m.)

9    BY MR. BLANCHARD:

10   Q.    All right.   That takes us through the body camera footage.

11        Agent Nielsen, at any point between your initial contact

12   with Defendant Wagner and him actually stepping into the van,

13   did you ever tell Defendant Wagner he was under arrest?

14   A.    No, I did not.

15   Q.    Between your initial contact with Defendant Wagner and him

16   stepping into the van, did you ever tell Defendant Wagner he

17   was being taken into custody?

18   A.    No, I did not.

19   Q.    And did you ever tell Defendant Wagner that he was

20   required to get into your vehicle, the van here in the video?

21   A.    No.

22   Q.    Did you ever draw your service weapon during your

23   encounter with Defendant Wagner up to this point?

24   A.    No, I did not.

25   Q.    Did you ever witness any other law enforcement officer

1  draw a weapon during your encounter with Defendant Wagner up to

2  this point?

3  A.   No.

4  Q.   Okay.  And up to this point, did you ever witness any

5  other law enforcement officer tell Defendant Wagner that he was

6  under arrest?

7  A.   No, I did not.

8  Q.   Okay.

9          MR. BLANCHARD:  I'm going to ask Amy --

10         If you'll go ahead and pull up Video Clip 1-A and

11  just pause it at the beginning before we start it.  Once you

12  get it on the screen, pause.

13         MS. McCLENDON:  (Complied.)

14  BY MR. BLANCHARD:

15  Q.   The video clip here, 1-A, does this video reflect the

16  first time that Defendant Wagner enters your van on May 9th,

17  2023?

18  A.   Yes, it does.

19  Q.   Okay.  And who set up the camera that's recording this

20  discussion between you and Defendant Wagner in the van here?

21  A.   I did.

22  Q.   Okay.  Is the camera visible?

23  A.   Yes.  It was on the dash.

24  Q.   Okay.  And during the interview, is it apparent that the

25  camera is recording?

A.    Yes.   There's a red light on top of the camera that
activates whenever it's recording.

Q.    And will you just give us a general description of, like,
what this camera looks like and how you set it up.

A.    Sure.   So it's a bifold camera essentially made up of two
pieces of plastic.   Each one's probably 4 by 6 inches.   So it's
like a clam shell.   It folds in half and opens back up.   So I
just had it in the open, kind of, 90-degree position on the
dash positioned towards the seats in the car.

Q.    Okay.

        MR. BLANCHARD:   Amy, if you'll go ahead and start the
video.

        (Video played from 1:29 p.m. to 1:29 p.m.)

BY MR. BLANCHARD:

Q.    All right.   So after you get in the van here, how does the
conversation between you and Defendant Wagner start?

A.    I just introduce myself and gather his basic identifying
information.

Q.    Okay.   I think we got a clip of that.

        MR. BLANCHARD:   Amy, will you pull up 1-O.   And if
you'll start it and pause it at the beginning there.

        MS. McCLENDON:   (Complied.)

BY MR. BLANCHARD:

Q.    All right.   The time stamp at the beginning of this video
here on the bottom left corner of the screen, that's 7:51 a.m.;

1    is that -- do you see that?

2    A.    Yes.

3    Q.    And is that accurate?

4    A.    Yes.

5    Q.    Okay.

6             MR. BLANCHARD:  Amy, will you restart.

7         (Video playing from 1:30 p.m. to 1:31 p.m.)

8    BY MR. BLANCHARD:

9    Q.    All right.  Does this clip accurately reflect the

10   beginning of your conversation with Defendant Wagner in the

11   van?

12   A.    Yes, it does.

13   Q.    Okay.

14            MR. BLANCHARD:  Amy, would you pull up Clip 1-P.  I'm

15   going to have you, same thing, pause -- start it and pause the

16   video, please.

17            MS. McCLENDON:  (Complied.)

18   BY MR. BLANCHARD:

19   Q.    All right.  So early in your conversation with

20   Defendant Wagner, does he inform you that he was working as a

21   corrections officer?

22   A.    Yes, he does.

23   Q.    Okay.

24            MR. BLANCHARD:  Amy, would you start the video,

25   please.

24

1        (Video played from 1:31 p.m. to 1:37 p.m.)

2    BY MR. BLANCHARD:

3    Q.    Agent Nielsen, does that clip accurately reflect what

4    Defendant Wagner told you about his employment and training as

5    a corrections officer?

6    A.    Yes, it does.

7    Q.    And he referenced one acronym there.  I just want to see

8    if you know what it means.  He referenced BCOT.

9         Does that stand for basic correctional officer training?

10   A.    Yes, it does.

11   Q.    Okay.

12        MR. BLANCHARD:  Amy, if you'd pull up Video Clip 1-B.

13   Start it and then pause at the beginning there, please.

14        MS. McCLENDON:  (Complied.)

15   BY MR. BLANCHARD:

16   Q.    So, Agent Nielsen, I'm going to direct you to the time

17   stamp there, bottom left.

18        The time stamp at the beginning of this video is

19   8:06 p.m.; is that accurate?

20   A.    8:06 a.m.

21   Q.    I'm sorry.  Yes.  Thank you for correcting me.

22        8:06 a.m.; is that right?

23   A.    (No response.)

24        MR. BLANCHARD:  Amy, if you'd restart the video,

25   please.

25

1          (Video played from 1:38 p.m. to 1:38 p.m.)

2     BY MR. BLANCHARD:

3     Q.   Agent Nielsen, is this where you tell Defendant Wagner

4     that he's not under arrest?

5     A.   That's correct.

6     Q.   And how did you interpret Defendant Wagner's response to

7     that statement that you made to him?

8     A.   That acknowledged what I said, understood it, and was in

9     agreement.

10    Q.   Okay.  Up to this point, the video that we're watching,

11    it's about -- almost 8:07 a.m. there on the screen.

12         Had you and Defendant Wagner had any discussion regarding

13    whether or not he had violated any law up to this point?

14    A.   No.

15    Q.   Okay.

16             MR. BLANCHARD:  Amy, if you'd pull Video Clip 1-C and

17    play it, please.

18         (Video played from 1:39 p.m. to 1:41 p.m.)

19    BY MR. BLANCHARD:

20    Q.   Agent Nielsen, does this clip reflect where you requested

21    consent from Defendant Wagner to search his phone?

22    A.   Yes, it does.

23    Q.   And did he decline to give you consent?

24    A.   He did decline.

25             MR. BLANCHARD:  Amy, if you'd please pull up

26

1    Clip 1-D, please.

2         (Video played from 1:41 p.m. to 1:44 p.m.)

3    BY MR. BLANCHARD:

4    Q.   And, Agent Nielsen, does this clip reflect where you

5    requested consent from Defendant Wagner to search his email

6    accounts?

7    A.   Yes, it does.

8    Q.   Did he give you full consent?

9    A.   No, he did not.

10   Q.   Can you explain what Google Photos is to the Court.

11   A.   Sure.  So Google itself is an electronic service provider.

12   They offer multiple services to their users.  That includes a

13   search browser, map services, email accounts.  Google Photos

14   is another one of their services.  It is a cloud-based imagery

15   storage service.  You can store pictures and videos there and

16   access it using your Google account login.

17   Q.   Okay.  And is that the caveat that he removed from the

18   consent, removing the Google Photos application from the

19   consent to search?

20   A.   Yes, that is correct.

21   Q.   Okay.  And did Defendant Wagner ultimately execute a

22   consent to search as to his Google email account specifically?

23   A.   Yes.

24   Q.   Okay.

25         MR. BLANCHARD:  Amy, would you pull up Video

27

1    Clip 1-E, please.

2          (Video played from 1:45 p.m. to 1:51 p.m.)

3    BY MR. BLANCHARD:

4    Q.    And, Agent Nielsen, is this the clip that reflects

5    Defendant Wagner's review and execution of the consent to

6    search his Google email accounts?

7    A.    Yes.

8          MR. BLANCHARD:    Amy, would you pull up Exhibit 3,

9    please.

10          MS. McCLENDON:    (Complied.)

11   BY MR. BLANCHARD:

12   Q.    And, Special Agent Nielsen, I'm going to have you review

13   the form on the screen there, which is Exhibit 3, which has

14   already been admitted.

15          Is this a true and accurate copy of the consent to search

16   form that Defendant Wagner executed in the van in the clip we

17   just saw?

18   A.    Yes, it is.

19          MR. BLANCHARD:    And, Amy, would you mind highlighting

20   the last paragraph in the signature block there for us.

21          MS. McCLENDON:    (Complied.)

22   BY MR. BLANCHARD:

23   Q.    And Defendant Wagner explicitly excluded the Google Photos

24   platform from that consent; is that right?

25   A.    Yes, that's correct.

1   Q.   Okay.  Can you read the last paragraph of the consent form

2   there.

3   A.   I provide this written consent freely and voluntarily

4   without fear, threats, coercion, or promises of any kind.  I

5   understand that I have the right to refuse to provide this

6   consent, and I voluntarily waive that right.

7       I understand that I may withdraw this consent at any time

8   by providing written notification to the HSI official listed

9   below or another official associated with the investigation;

10  however, I also understand that all information obtained or

11  examined by HSI may be lawfully seized and used as evidence.

12  Q.   And that's his signature beneath that; right?

13  A.   That's correct.

14          MR. BLANCHARD:  Amy, if you would, please, pull up

15  Video Clip 1-F.

16      (Video played from 1:53 p.m. to 1:53 p.m.)

17  BY MR. BLANCHARD:

18  Q.   All right.  So this is a snippet of the clip we just

19  watched.  But in this little snippet, Agent Nielsen, you

20  mentioned driving up to Defendant Wagner's house.

21      Can you describe, in relation to Defendant Wagner's house,

22  where the van was parked when the interview began.

23  A.   So we are parked on the roadway leading up to Mr. Wagner's

24  house.  So Sophia Drive is a dirt/gravel roadway.  We are

25  parked near the end of it.  And the end of that road ends at

1    the base of Mr. Wagner's driveway.  So we can see his driveway

2    from where we are, but the driveway then kind of leads, winding

3    up, onto the property to his residence.

4    Q.    Okay.  At this point, looking at the timestamp, a little

5    over an hour has passed since the interview in the van began;

6    is that right?  I believe we talked about the beginning.  It

7    started around 7:51.

8          And at this point, it's 8:52 on the screen there; is that

9    accurate?

10   A.    Yes.

11   Q.    Okay.

12          MR. BLANCHARD:  Amy, if you could pull up Video 1-H,

13   please.

14         (Video playing at 1:54 p.m.)

15          MR. BLANCHARD:  Would you pause it there just a

16   second, Amy.

17         (Video stopped at 1:55 p.m.)

18   BY MR. BLANCHARD:

19   Q.    Agent Nielsen, in this clip, you asked Defendant Wagner if

20   you could drive up to the house; is that accurate?

21   A.    That's correct.

22   Q.    And how did he respond to that?

23   A.    That that was fine.

24   Q.    Okay.

25          MR. BLANCHARD:  You can restart, Amy.

30

1          (Video playing at 1:55 p.m.)

2              MR. BLANCHARD:  All right.  Amy, if you'd pause it

3      there, please.

4          (Video stopped at 1:56 p.m.)

5      BY MR. BLANCHARD:

6      Q.   All right.  So before you start to drive here, you mention

7      something in your hand and tell Defendant Wagner that you're

8      going to put it back in his car if that's okay with him.

9          What were you referring to?

10     A.   His employment IDs that were found on his person during

11     the execution of the search warrant.

12     Q.   Okay.  And your intention was to give those IDs back to

13     Defendant Wagner by putting them in his vehicle?

14     A.   Correct.

15     Q.   Okay.  His car was searched pursuant to a warrant.

16         Was his car ever taken from the residence by law

17     enforcement?

18     A.   No, it was not.

19     Q.   Okay.  And at this point, it's right at 9:00 a.m. here on

20     the screen, bottom left, according to the timestamp.

21         And that's when you start driving up to the house; is that

22     right?

23     A.   Correct.

24     Q.   Okay.

25              MR. BLANCHARD:  Amy, will you restart.

31

1        (Video playing at 1:57 p.m.)

2            MR. BLANCHARD:  Amy, would you pause it there.

3        (Video stopped at 1:58 p.m.)

4    BY MR. BLANCHARD:

5    Q.    All right.  So, at this point in time, we're at 9:01:23

6    on the time stamp, and you are now parked in front of Mr. -- or

7    Defendant Wagner's residence; is that right?

8    A.    That's correct.

9    Q.    So it took you a little over a minute to pull from the

10   road where the interview initially started up to his residence

11   in the van; is that accurate?

12   A.    Yes.

13   Q.    All right.  During the drive, what did you ask

14   Defendant Wagner about what he needed?

15   A.    I asked him if he needed anything.

16   Q.    Okay.  And how did he respond to that?

17   A.    That he didn't; he was fine.

18   Q.    Okay.  And at this point, you park, and you take a break;

19   is that right?

20   A.    Yes.

21   Q.    And what did you do on the break?

22   A.    I went inside and checked in with the premises search

23   warrant team, which included seeing where the search was at,

24   if any evidence had been seized, any devices forensically

25   processed, just following up with the interior team and then

1    updating them with any information I had obtained during the

2    search -- during the interview process.

3    Q.    Okay.

4              MR. BLANCHARD:   Amy, would you restart, please.

5          (Video played from 1:59 p.m. to 1:59 p.m.)

6    BY MR. BLANCHARD:

7    Q.    All right.   And that's the end of the clip there.

8          So, at this point, you get out of the van; is that right?

9    A.    Correct.

10   Q.    You go in the residence?

11   A.    Correct.

12   Q.    And you left Defendant Wagner with Investigator Connelly

13   during the break.

14         Why?

15   A.    A couple of reasons.   If Mr. Wagner had needed anything, I

16   wanted to make sure there was somebody there to either meet

17   that need or communicate it to me so it could be met.   I left

18   him in my vehicle, and my vehicle was running.   And so since

19   it's government equipment, I couldn't just leave him there by

20   himself, so Investigator Connelly stayed.

21         And then as part of the operational plan, how the search

22   warrant was executed, anybody that was identified on scene

23   during the execution of the search warrants had a law

24   enforcement official with them for the duration of the search

25   both for the protection of law enforcement on the scene but

1  also the protection and security of evidence.

2  Q.   Okay.  All right.  Did you inform Defendant Wagner of any

3  restrictions on actions or movements before you got out of the

4  van to go in the residence?

5  A.   No.

6  Q.   All right.  Was the van unlocked during the break?

7  A.   It was.

8  Q.   And was the van unlocked during the interview?

9  A.   Yes.

10  Q.   All right.  Did Defendant Wagner ever ask you to leave the

11  van up to this point?

12  A.   No, he did not.

13  Q.   And prior to this break, did Defendant Wagner admit to any

14  involvement in child pornography whatsoever?

15  A.   No.

16  Q.   And according to the timestamp, at this point, we're at

17  9:01 and 27 seconds; is that right?

18  A.   Yes.

19  Q.   All right.

20       MR. BLANCHARD:  Amy, if you'll pull up Clip 1-I,

21  please, and pause it there at the beginning.

22       MS. McCLENDON:  (Complied.)

23  BY MR. BLANCHARD:

24  Q.   And so this is a clip of you getting back in the van after

25  the break; is that right?

34

A.   That's correct.

Q.   And how long did the break last?  So we were at 9:01 just a minute ago, and we're now here at 9:52.

A.   About 50 minutes.

Q.   Okay.

        MR. BLANCHARD:  Amy, if you'll restart the video, please.

        (Video played from 2:01 p.m. to 2:01 p.m.)

BY MR. BLANCHARD:

Q.   All right.  So immediately upon returning from break, what do you ask Defendant Wagner?

A.   I ask him again if he needs anything.

Q.   What did he say?

A.   That he's all right; he doesn't.

Q.   Okay.  And where is the van parked at at this point?

A.   This is parked in front of his home.

Q.   And you can see his home from the van at this point?

A.   Yes.

Q.   Okay.  After asking Defendant Wagner if he needs anything else, at this point, how do you elect to continue the interview?

A.   I make the decision to share with him more about our investigation and the evidence that we have identified up until that point specifically relating to his involvement with child pornography.

35

1    Q.    Okay.

2            MR. BLANCHARD:  Amy, will you play Clip 1-J, please.

3        (Video played from 2:02 p.m. to 2:02 p.m.)

4    BY MR. BLANCHARD:

5    Q.    Could you hear the audio on that clip?

6    A.    I couldn't.

7    Q.    This is the lowest audio clip, and so I'm going to have

8    Amy replay it.  It's a very short clip, and I'm going to have

9    her replay it.  And see if you can sort of hear the audio and

10   hear what you're saying.

11   A.    Sure.

12        (Video played from 2:02 p.m. to 2:02 p.m.)

13   BY MR. BLANCHARD:

14   Q.    Could you hear it there?

15   A.    I'm reminding him again that he's not under arrest.

16   Q.    Okay.  And that was my question.

17        What did you say to him at that point?

18   A.    I'm reminding him again he's not under arrest.

19   Q.    Okay. All right.  So you tell Defendant Wagner again he's

20   not under arrest at this point.

21        How long after this point in the conversation does he

22   admit to accessing and distributing child pornography online?

23   A.    About 15 minutes.

24   Q.    Okay.  And, generally, what does he tell you about his

25   involvement?  That's a long conversation that lasts over an

1   hour.  Just give us a summary of what he tells you during that

2   conversation.

3   A.   He says that he used the internet to search for and access

4   child pornography, that he sent and received child pornography

5   within online chat groups, and that he acted as an administrator

6   for one of those chat groups.

7   Q.   Okay.  Thank you.

8        Prior to admitting to accessing and distributing the child

9   pornography online, did Defendant Wagner ever indicate to you

10  that he wanted to consult with a lawyer?

11  A.   No, he did not.

12  Q.   Did Defendant Wagner ever indicate to you that he no

13  longer wanted to talk to you?

14  A.   No.

15  Q.   Did he ever indicate to you that he wanted to leave the

16  van?

17  A.   No.

18  Q.   Okay.  And prior to admitting -- or Defendant Wagner

19  admitting that he accessed and distributed child pornography

20  online, did you ever promise Defendant Wagner anything in

21  exchange for that admission?

22  A.   No, I did not.

23  Q.   Did you ever yell at him?

24  A.   No.

25  Q.   Ever threaten him?

37

A.   No.

Q.   How would you describe the tone of your conversation with Defendant Wagner up to the point of his beginning to discuss involvement with child pornography?

A.   I'd describe the tone as cordial, comfortable, professional.

Q.   Okay.

        MR. BLANCHARD:  Amy, would you pull Video 1-K, please.  And just start it and pause it at the beginning for me.

        MS. McCLENDON:  (Complied.)

BY MR. BLANCHARD:

Q.   All right.  So after Defendant Wagner admits involvement with child pornography, as an investigator and as an agent, what's your next concern?

A.   My next concern is whether he's committed any hands-on sexual abuse acts against children.

Q.   Okay.  And before we play this clip, you can see the camera angle.  It's shifted here a little bit.  Can you explain what happened that changed the view on the camera at this point.

A.   It appears that the camera or one of the cables connecting the camera were bumped, which just shifted the camera on the dash.

Q.   Okay.

38

1      MR. BLANCHARD:  All right.  Amy, would you restart,

2  please.

3      (Video played from 2:05 p.m. to 2:08 p.m.)

4  BY MR. BLANCHARD:

5  Q.   All right.  So, Agent Nielsen, how do you address your

6  concern of whether Defendant Wagner had maybe touched a child

7  in a sexual way?

8  A.   I specifically ask him if he's ever had sexual contact

9  with a child under the age of 18.

10 Q.   And did you make any offers for a polygraph to prove that?

11 A.   I did.

12 Q.   Okay.  Did Defendant Wagner agree to take a polygraph?

13 A.   He did.

14 Q.   And where was the polygraph set up?

15 A.   At the Dodge County Sheriff's Office.

16 Q.   Did you give Defendant Wagner the option of driving

17 himself to the polygraph?

18 A.   I did.

19 Q.   And what did he say?

20 A.   That we could drive him instead.

21 Q.   Okay.  Did you tell Defendant Wagner anything about

22 whether he had to take a polygraph?

23 A.   I told him that it was voluntary.

24 Q.   Okay.  And you took another break at this point; is that

25 correct?

39

1    A.    That's correct.

2    Q.    And why?

3    A.    To update our team on the inside as well as to contact the

4    polygraph examiner and let them know that Mr. Wagner had agreed

5    to take a polygraph examination.

6    Q.    Okay.  Thank you.

7          MR. BLANCHARD:  Amy, will you pull up Video 1-L,

8    please.

9          (Video played from 2:09 p.m. to 2:10 p.m.)

10   BY MR. BLANCHARD:

11   Q.    All right.  And prior to leaving the residence for the

12   polygraph, did you offer Defendant Wagner water or food?

13   A.    I did.

14   Q.    And does this clip reflect that?

15   A.    It does.

16   Q.    What did he say?

17   A.    He declined.

18   Q.    Okay.

19         MR. BLANCHARD:  Amy, 1 -- Video 1-M, please.

20         (Video played from 2:10 p.m. to 2:11 p.m.)

21   BY MR. BLANCHARD:

22   Q.    All right.  So after the break, you have a short

23   conversation with Defendant Wagner.

24         What were you asking him about?

25   A.    I was clarifying some device use information and then some

40

1    accountant indentifiers with him.

2    Q.    Okay.  And then at the end of this clip, I think you ask

3    him if he's ready to go to the polygraph; is that correct?

4    A.    Correct.

5    Q.    And how does he respond?

6    A.    That he is.

7    Q.    Okay.  So from the time you make contact with

8    Defendant Wagner in the morning until the time you leave the

9    residence to drive to the polygraph, do you know about how

10    much time has elapsed?

11    A.    Less than 4 hours.

12    Q.    Okay.  And that includes the breaks that you took; is that

13    right?

14    A.    Correct.

15    Q.    Okay.

16            MR. BLANCHARD:  Amy, will you pull up Video 1-N and

17    just hold on for just a second before you start it.

18            MS. McCLENDON:  (Complied.)

19            MR. BLANCHARD:  So this one is a clip that's made

20    while driving, so the audio is a little bit more bumpy and hard

21    to hear, and so I'll just let you guys know that in advance.

22    If we need to adjust the volume, we can pause.

23            If you'll go ahead and play, Amy.

24        (Video played from 2:12 p.m. to 2:13 p.m.)

25                    (No omissions)

1    BY MR. BLANCHARD:

2    Q.    All right.  So this conversation occurs while you're

3    driving from the residence to the polygraph location; is that

4    accurate?

5    A.    That's correct.

6    Q.    And what did Defendant Wagner say when you asked him about

7    how the van worked for the interview that you guys had?

8    A.    He said that it worked fine.  And I asked if he would have

9    preferred to interview somewhere else like the back porch, and

10   he said no, that the van was fine.

11   Q.    Okay.  So to recap, during the interview that occurred in

12   the van, did Defendant Wagner appear to you to be coherent in

13   his conversation with you?

14   A.    Yes, he did.

15   Q.    Okay.  Was he able to engage in a logical conversation

16   with you?

17   A.    Yes.

18   Q.    At any point during the interview in the van, did you tell

19   Defendant Wagner he was under arrest?

20   A.    No, I did not.

21   Q.    And at any point during the interview in the van, did you

22   tell Defendant Wagner he was required to talk to you?

23   A.    No, I did not.

24   Q.    At any point during the interview in the van, did you tell

25   Defendant Wagner he could not leave the van?

42

1    A.    No.

2    Q.    And at any point during the interview in the van, did

3    Defendant Wagner indicate that he no longer wanted to talk to

4    you?

5    A.    No.

6    Q.    At any point during the interview in the van, did you

7    make any promises to Defendant Wagner in exchange for his

8    admissions?

9    A.    No, I did not.

10   Q.    And at any point during the interview in the van, did you

11   make any threats to Defendant Wagner in order to elicit any

12   admissions?

13   A.    No.

14            MR. BLANCHARD:  Your Honor, those are all the

15   questions that I have.

16            THE COURT:  All right.  Any cross?

17            MS. MADDOX:  Yes, Your Honor.

18            THE COURT:  Anybody need to take a break before we

19   begin?

20            MS. MADDOX:  That would be a great idea.

21            THE COURT:  All right.  Do you want some time to talk

22   with your client?

23            MS. MADDOX:  Restroom.

24            THE COURT:  Restroom.  Yeah.  Okay.  Well, just take

25   as much time as you need, and we'll reconvene when everybody's

43

1    ready.

2              COURT SECURITY OFFICER:  All rise.

3         (A recess was taken from 2:15 p.m. to 2:26 p.m.)

4                        CROSS-EXAMINATION

5    BY MS. MADDOX:

6    Q.   Good afternoon, Agent Nielsen.  My name is Tina Maddox,

7    and I represent Mr. Wagner.  I do have a few questions for you.

8         You would agree with me that this whole process started

9    about 7:36 in the morning on -- what was it? -- May the 9th of

10   2023; is that correct?

11   A.   I believe my interview with him started at about 7:50, so

12   I'd have to look at any earlier time stamps to clarify that.

13   Q.   Okay.  Well, if you look back at Clip 10, if we bring that

14   up . . .

15              MS. McCLENDON:  Would you like me to play it?

16              MR. BLANCHARD:  Play it, Tina?

17              MS. MADDOX:  Yes, please.

18        (Video played at 2:27 p.m.)

19              MS. MADDOX:  All right.  If you would pause it there.

20        (Video stopped at 2:27 p.m.)

21   BY MS. MADDOX:

22   Q.   All right.  So can you tell me, then, what time is

23   displayed on this particular time stamp.

24   A.   7:35.

25   Q.   And this is when the whole process with Mr. Wagner began;

44

1    is that correct?

2    A.    Yes, ma'am.

3    Q.    Okay.  So you would agree with me that it began around

4    7:36 on that morning?

5    A.    Yes, ma'am.

6    Q.    Okay.  At that point in time -- later on in the same

7    video -- and I'm not going to ask that it be played any

8    further.

9         But around 7:37 in the morning, you acknowledge that you

10   grabbed him by the arm and escorted him away; is that correct?

11   A.    I don't know that I'd use the same language to describe

12   it, but I did redirect him from the road by touching his arm,

13   yes, ma'am.

14   Q.    Well, you had your arm -- your hand around his arm; is

15   that correct?

16   A.    Yes, ma'am.

17   Q.    And this roadway that you're referring to is not a major

18   thoroughfare; is that correct?

19   A.    That's correct.

20   Q.    It is actually a limited -- more like, I would call it, a

21   pig path that goes to and ends at his home; is that correct?

22   A.    It's a dirt roadway that ends at his home, but it's not a

23   major thoroughfare.

24   Q.    And there was not any large amount of traffic there other

25   than law enforcement; is that correct?

45

1    A.    Yes, ma'am, that's correct.

2    Q.    Okay.  So there really was no need to redirect him out of

3    traffic because there was none; right?

4    A.    I would disagree with you on that.

5    Q.    Where was the traffic?

6    A.    It was the caravan that you see in the later video.  It

7    was our premises search warrant team that was preparing to come

8    down that roadway.

9    Q.    Okay.  Well, let's talk about that for a minute.

10          So the caravan that you refer to, how many automobiles

11   were in that caravan?

12   A.    Three to four, I believe.

13   Q.    Three to four?

14   A.    (Nodded head.)

15   Q.    And how many total officers in the two teams that you had

16   were there on scene?

17   A.    I don't know that number off the top of my head.  I'd have

18   to go back and look at our roster.

19   Q.    Okay.  Was it more than 5?

20   A.    Yes, ma'am.

21   Q.    More than 10?

22   A.    Yes, ma'am.

23   Q.    More than 15?

24   A.    I couldn't say other than that.

25   Q.    Definitely more than 10?

46

1    A.    Yes, ma'am.

2    Q.    So 10-plus officers were on scene; correct?

3    A.    Were involved in the search warrant execution, yes, ma'am.

4    Q.    Gotcha.  All right.  So when you escorted him by the arm

5    and went over to the other vehicle, at that point, at 3 minutes

6    and 13 seconds into that particular video, you were actually

7    executing a search warrant there on his person; is that

8    correct?

9    A.    Yes, ma'am.

10    Q.    So you had his person detained to search it; right?

11    A.    Yes, ma'am.

12    Q.    And, also, since you had a search warrant on his person,

13    he didn't have the option at that point to not get searched,

14    did he?

15    A.    He did not, no, ma'am.

16    Q.    He was under the control of you as an officer of the law;

17    is that correct?

18    A.    During the execution of that search warrant --

19    Q.    Okay.

20    A.    -- yes, ma'am.

21    Q.    Also, at that exact same time, you informed him that you

22    had a search warrant of his automobile; is that correct?

23    A.    I don't recall discussing the vehicle search warrant with

24    him at that time.

25    Q.    Okay.  Even if you didn't discuss it with him, isn't it

47

1    true you had a search warrant authorizing the search of his

2    vehicle?

3    A.    Yes, ma'am.

4    Q.    So, at that point, both his person and his automobile were

5    not free to leave the scene of that incident -- correct? --

6    A.    Yes, ma'am.

7    Q.    -- because both of them had to be searched?

8    A.    Yes, ma'am, that's correct.

9    Q.    Got it.

10        Now, with regard to Clip 1-A, you acknowledge that there's

11   a red light on the camera inside that van; is that right?

12   A.    Yes, ma'am.

13   Q.    And it's apparent that it's recording?

14   A.    Yes, ma'am.

15   Q.    You placed him in the back of the van; is that right?

16   A.    Yes, ma'am.

17   Q.    And he was actually, I'm going to say, penned in because

18   there was an officer up front with a gun; correct?

19   A.    Correct.

20   Q.    Did you have a gun in the back?

21   A.    Yes, ma'am, I did.

22   Q.    And you were in the back with him; is that right?

23   A.    Yes, ma'am.

24   Q.    Now, it's a van.  Vans often come equipped with child

25   safety locks.

48

1    Did this van have a child safety lock?

2  A.    It did not have a child safety lock engaged, no, ma'am.

3  Q.    That wasn't my question.

4    Did it have a child safety lock?

5  A.    I would have to assume that it does, but I've never

6  checked.

7  Q.    Okay.  So he was in the back of the vehicle accompanied

8  by yourself and another officer, both of which who were armed;

9  correct?

10  A.    Yes, ma'am.

11  Q.    And, at that point, you had not told him he was released

12  from the search warrant of his person, did you?

13  A.    That is correct.

14  Q.    Now, if you look at the recording on 1-P at about 7:58,

15  would you agree with me that, through this whole process, you

16  were very nice to him?

17  A.    Yes, I would agree with you on that.

18  Q.    It was kind of in a buttering-up kind of way?

19  A.    I don't know that I would describe myself as buttering up,

20  but I would agree that I was kind.

21  Q.    Okay.  Do you acknowledge that, throughout this interview

22  and particularly at the 8:50 mark, my client was rubbing his

23  eyes?

24  A.    I recall one of the clips earlier.  He rubbed one of his

25  eyes during that clip, yes, ma'am.

49

1    Q.    Okay.  He did it more than once.

2          Are you aware of that?

3    A.    When I watched it just now in court, there was one time

4    that I noticed.

5    Q.    Okay.  Have you watched this video other than today ever?

6    A.    Yes, ma'am.

7    Q.    And did you watch it from start to finish?

8    A.    Yes, ma'am.

9    Q.    And how many times have you watched it?

10   A.    I'm not sure.

11   Q.    Okay.  Did you watch the portion where -- at 8:58

12   where you indicated you were going to leave him there with

13   Investigator -- was it Connelly?

14   A.    Connelly, yes, ma'am.

15   Q.    Okay.  You watched that part?

16   A.    Yes, ma'am.

17   Q.    And, at that point, you actually got out of the back,

18   went around, got into the driver's seat, and Connelly got in

19   the back with him; is that correct?

20   A.    I'm not sure if we're referring to the same person.

21         Are you referring to when I was driving to the house and

22   Investigator Connelly got in the back seat?

23   Q.    Yes.

24   A.    Yes, ma'am.

25   Q.    So y'all swapped sides?

A.    Yes, ma'am.

Q.    Okay.  Now, you -- at 9:01 in the morning, you did ask him if he needed any water; is that correct?

A.    Yes, ma'am.

Q.    And isn't it true that strongly suggests that he wasn't able to go get it himself?

A.    No, ma'am.

Q.    No.  Okay.

      At 9:52, he again is visibly tired.  And, at that point, he brushes his hair from his eyes, and he's leaned back in the seat.

      Do you recall that?

A.    I recall seeing those things, yes, ma'am.

Q.    Okay.  And I think that's when you actually left to go check on other things.

      You did watch where he was speaking to Investigator -- or Officer Connelly while you were gone?

A.    No, ma'am.

Q.    You didn't watch that part?

A.    At some point in typing the interview, I would have early on but not in preparation for this hearing.

Q.    Okay.  Are you aware that he asked that officer why he couldn't leave?

A.    I'm not aware of that conversation.

Q.    Okay.  And are you also aware that he told that officer

51

1    at -- about the times -- that he had just gotten off work -- he

2    had just worked a 12-hour shift and gotten off?

3    A.   I'm not aware of any communications that happened when I

4    wasn't present.

5    Q.   Okay.  So you don't normally debrief any officers that are

6    left unattended with your subjects?

7    A.   Information is typically passed to me as needed, but I

8    don't recall Investigator Connelly sharing anything with me

9    that day.

10   Q.   And my client actually asked, "why do y'all keep me in

11   here?"

12        You don't remember any of that?

13   A.   If that was said to Investigator Connelly, I wouldn't have

14   been privy to that conversation.

15   Q.   Right.  But you testified earlier that you watched this

16   video in preparation, in general, for this case at least once;

17   correct?

18   A.   I also just testified that I didn't watch the portions

19   where it was just your client and Investigator Connelly in the

20   vehicle.

21   Q.   So you don't think that the portions where you were not

22   present are not [sic] relevant?

23   A.   I believe that I'm able to testify to what conversations I

24   had with Mr. Wagner.  I wasn't present for conversations he had

25   with other officers, so I don't believe I can testify to those.

52

1    Q.    Okay.  Would you agree with the statement that normally
2    Mr. Wagner would have been asleep by the time you had gotten
3    that far into the investigation, about 9:52 in the morning?
4    A.    I don't think there's any way for me to know that or agree
5    to that.
6    Q.    We'll talk about that in a minute.
7          You made a statement earlier that the conversation was
8    less than 4 hours.
9          Isn't it true it was very close to 4 hours?
10   A.    No, ma'am.
11   Q.    No?  Okay.
12         Well, isn't it true, at the least, that the interaction
13   was very close to 4 hours?
14   A.    For me, I think interaction and conversation would be the
15   same thing, so I'd have to say no.  I was not in the car with
16   him for 4 hours.
17   Q.    How far is it from 7:36 in the morning, which we agree
18   that's when this whole thing started, to 11:18 that morning?
19   How many hours is that?
20   A.    It would be just under 4 hours -- just over 4 hours.
21   Q.    Okay.  So that was quite a lengthy interaction.
22         Do you agree?
23   A.    That's -- I would agree that he was in conversation or
24   around law enforcement for the duration of that time.
25   Q.    And you went on -- at 11:19, you stated, "If I check with

53

1    my team, if they are finished with your vehicle, you could

2    drive yourself there."

3         You did say that; right?

4    A.   Yes, ma'am.

5    Q.   But if they weren't, he could not have driven hisself;

6    correct?

7    A.   Or we would have had to discuss other options or wait for

8    the car to be finished.

9    Q.   Okay.  And do you agree that a tired driver is the same

10   thing as an impaired driver?

11   A.   I think that our level of, I guess, rest or alertness can

12   impact our ability to focus while we're driving.

13   Q.   Okay.

14        (Defense Counsel and Defendant conferred.)

15   BY MS. MADDOX:

16   Q.   And at the beginning of this encounter, there were

17   flashing lights that started the encounter at 7:36; is that

18   correct?

19   A.   Yes, ma'am.

20   Q.   Okay.  Now, you acknowledge that you had done your

21   homework on Mr. Wagner; is that right?

22   A.   I believe so.

23   Q.   Right.  You had already found out where he worked?

24   A.   Correct.

25   Q.   You already knew what hours he worked?

54

1    A.    Generally, yes.

2    Q.    So you knew that he would be coming off of a full shift

3    when you went to that premises at 7:36 on May 9th of 2023;

4    correct?

5    A.    Yes, ma'am.

6    Q.    You knew he would have worked the entire night before;

7    right?

8    A.    Yes, ma'am.

9    Q.    Okay.  You admit that you did not, at any point during the

10   course of this encounter, read him his Miranda rights?

11   A.    I did not.

12   Q.    Okay.  And you admit that no one under your charge read

13   him his Miranda rights?

14   A.    That's correct.

15   Q.    Okay.  And it would be safe to say you fully intended to

16   arrest Mr. Wagner at the end of any encounter you had with him

17   on this particular day?

18   A.    No.

19   Q.    No?  Okay.

20         You never told him he was free to leave?

21   A.    Not in those words, no, ma'am.

22   Q.    You never told him, "You're free to leave"?

23   A.    No, I did not.

24   Q.    Okay.  And, in fact, you offered him food; right?

25   A.    I did.

55

Q.   You offered him water?

A.   Yes.

Q.   But you never offered him a chance to go to sleep, did

you?

A.   I did not.

Q.   And you knew he had just gotten off work?

A.   Yes, I did know.

Q.   Okay.  You never released him from the search warrant of

his person, did you?

A.   Not verbally, I guess, ma'am, no.

Q.   Well, how else would you do it other than verbally?

A.   (No response.)

Q.   And you never released his car to him; is that correct?

A.   No, ma'am, that's not correct.

Q.   That morning, did you release his car to him to drive?

A.   His car was left on scene, and he was given the option to

drive it if it was ready to be driven.  But his car was never

taken into our custody.  It remained on scene.

Q.   Right.  But you never, in the video, said, "Okay.  Your

car is free.  You can drive it yourself."

     Did you do that?

A.   I didn't have to because he asked for a ride instead.

Q.   Okay.  Perhaps because he was so tired?

A.   I wouldn't be able to answer that question.

          MS. MADDOX:  Nothing further.

1          THE COURT:  Anything follow-up to that?

2          MR. BLANCHARD:  Brief redirect, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. BLANCHARD:

5    Q.   Agent Nielsen, I just want to cover a few of the questions

6    that Counselor Maddox has asked you.

7          So she started out talking to you about referring to the

8    road as not a major thoroughfare.

9          Do you remember that line?

10   A.   I do.

11   Q.   Can you explain to the Court who developed the operations

12   plan in this case.

13   A.   It was a team approach: myself, one of the co-case agents

14   from the HSI Savannah office, along with Dodge County Sheriff's

15   office.

16   Q.   Okay.  And were you aware of how the operations plan would

17   be executed on the day of the search?

18   A.   Yes, I was.

19   Q.   Okay.  Can you start and explain with -- the planned

20   traffic stop of Defendant Wagner and what you knew was about to

21   happen with the other search team that morning.

22   A.   Okay.  So we had officers and agents stationed along not

23   the road that Mr. Wagner lived off of but the main road that

24   was adjoined to that road and some other points in the city

25   along the route we expected Mr. Wagner to take.  When

1    Mr. Wagner was seen pulling onto the roadway leading to his

2    residence, the marked units -- the plan was for them to pull in

3    behind him to follow him to his residence and initiate a

4    traffic stop as he was approaching or entering the driveway for

5    his residence.

6         Once that contact was made, myself and Investigator

7    Connelly would come up, execute the search warrant on

8    Mr. Wagner's person, give him the opportunity to interview.

9    While that was happening, it would also be communicated with

10   the second search warrant execution team that was responsible

11   for the premises search warrant.

12        At the same time all of that is happening, they would be

13   approaching on that roadway.  As long as we had determined that

14   it was -- that we had control of the situation on the roadside,

15   that it would be safe for them to approach and kind of continue

16   on past that to the residence, then they would go up to the

17   premises, make contact with anybody there, and execute the

18   search warrant.

19   Q.   Okay.  And does that play into the reason of why you

20   redirected Mr. Wagner away from the roadway?

21   A.   It does.

22   Q.   How long do you estimate that you touched Mr. Wagner's arm

23   to redirect him from the roadway to the side of the road?

24   A.   4 to 5 seconds, maybe.

25   Q.   Okay.  Counselor Maddox also referenced, you know, in her

1    terms, you penning in Defendant Wagner in your van and that you

2    had a gun.

3         Did you brandish your gun at any point during the

4    interview with Mr. Wagner?

5    A.    I did not.

6    Q.    Did you make any reference to your gun or Investigator

7    Connelly's gun at any point during the interview with

8    Defendant Wagner?

9    A.    No.

10   Q.    There was a point in time where, during the interview,

11   you're parked on the road near Defendant Wagner's driveway and

12   you elect to drive the van up to Defendant Wagner's residence.

13        Do you recall that?

14   A.    I do.

15   Q.    At that point, do you recall Investigator Connelly getting

16   in the back of the van and you getting in the front?

17   A.    I do.

18   Q.    Can you tell us why that was the way that that was handled

19   in the transition from the road, up the driveway to the house?

20   A.    In order to transport individuals, per our policy, there

21   would need to be two officers or agents in the vehicle

22   regardless.  But specifically with Investigator Connelly moving

23   to the back, primarily, it's a safety concern at that point as

24   I'm stepping into the driver's seat with an individual seated

25   behind me.  For the safety of everybody involved, there needs

59

1    to be somebody else back there with them.

2    Q.    Okay.  And during the drive, Defendant Wagner was situated

3    directly behind you; is that correct?

4    A.    He was.

5    Q.    Okay.  Let's talk about the ultimate arrest in this case.

6          Did you arrest Defendant Wagner on the day of the search?

7    A.    No.

8    Q.    Was he arrested on federal charges on the day of the

9    search?

10   A.    No.

11   Q.    Who arrested Defendant Wagner that day?

12   A.    Dodge County Sheriff's Office.

13   Q.    Okay.  And were those charges in any way related to

14   receipt or distribution of child pornography online?

15   A.    No.

16   Q.    You obtained a search warrant from this Court in order

17   to search Defendant Wagner's person, car, and residence that

18   morning; is that correct?

19   A.    Yes.

20   Q.    Did you obtain an arrest warrant from this Court prior

21   to executing the arrest -- the search warrant on Defendant

22   Wagner's car, person, or premises?

23   A.    No.

24            MR. BLANCHARD:  Okay.  Those are all I have,

25   Your Honor.

1          THE COURT:  Any follow-up, Ms. Maddox?

2          MS. MADDOX:  No.  Thank you, Your Honor.

3          THE COURT:  All right.  Thank you for your time and

4  testimony.  You may step down and remain in the courtroom if

5  you like.

6          Any further witnesses by the Government?

7          MR. BLANCHARD:  No, Your Honor.

8          THE COURT:  Any witnesses by the Defense?

9          MS. MADDOX:  No, Your Honor.

10          THE COURT:  Okay.  Any final arguments by the -- this

11  is your motion, so from you, Ms. Maddox, any closing remarks?

12          MS. MADDOX:  Your Honor, we agreed if the Court would

13  allow us to submit a closing argument via brief as opposed to

14  an oral one after the preparation of the transcript.

15          THE COURT:  Okay.  That's perfect.

16          And who's going to order the transcript?

17          MR. BLANCHARD:  Your Honor, the Government will order

18  the transcript.

19          THE COURT:  Okay.  All right.

20          Well, is there anything further in this matter we

21  need to discuss today before we take up the next case?

22          MR. BLANCHARD:  Not from the Government's perspective.

23          MS. MADDOX:  Not from the Defense, Your Honor.

24          THE COURT:  Well, as always, I knew walking in that

25  y'all would both be well prepared, and you were.  And briefs

1    were well done.  So thank you for all the hard work and

2    attention to detail y'all have put into the case so far.  It

3    makes my job a lot easier when I have good attorneys on both

4    sides.

5            And as I may have mentioned to the defendant at the

6    beginning of this case -- I'm not sure if I did or not.  I bet

7    I did.  But, you know, I'm proud of the criminal defense bar

8    that we have representing defendants in criminal cases here,

9    Mr. Wagner.  I'm proud of the fact we live in a country where,

10   when your freedom is at stake like this, we value each and

11   every citizen's freedom to such a degree that we make sure you

12   have quality representation in court.

13           And if you look at the Augusta and Statesboro and

14   Dublin Divisions at the lawyers we have on our panel who do

15   this work, number one, most of them are busy enough in their

16   own private practices that they don't have to take these cases.

17   And Ms. Maddox is certainly one of those who doesn't have to

18   take these cases.  But she takes it so that -- she takes these

19   cases for the same reason that so many others do.  It's because

20   they understand the value -- the critical importance of having

21   quality lawyers represent defendants in situations like this.

22           So if I didn't tell you already, I think you've seen

23   here today that you're in very good hands with her and she does

24   a very good job on her cases.

25           And so, Ms. Maddox, I appreciate the preparation you

62

1    always bring.

2              MS. MADDOX:  Thank you, Your Honor.

3              THE COURT:  All right.  If there's nothing further,

4    then -- are we ready to roll into -- we need a few minutes

5    before the next case, so we'll take a short recess.

6              MS. MADDOX:  Thank you, Your Honor.

7              THE COURT:  All right.  Thank you.

8              COURT SECURITY OFFICER:  All rise.

9         (Proceedings concluded at 2:47 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

63

C E R T I F I C A T E

    I, Victoria L. Root, Certified Court Reporter, in and for
the United States District Court for the Southern District of
Georgia, do hereby certify that, pursuant to Section 753,
Title 28, United States Code, the foregoing is a true, correct,
and complete transcript of the stenographically reported
proceedings held in the above-entitled matter and that the
transcript page format is in conformance with the regulations
of the Judicial Conference of the United States.

    WITNESS MY HAND AND SEAL this 20th day of May, 2024.

VICTORIA L. ROOT, CCR B-1691
United States Court Reporter
Southern District of Georgia
Savannah Division

Post Office Box 312
Meldrim, Georgia  31318
(912) 650-4066