IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF GEORGIA

DUBLIN DIVISION

UNITED STATES OF AMERICA          )
                                  )
        v.                        )          CR 323-005
                                  )
AUSTON COLE WAGNER                )

---

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

The Indictment charges Defendant Auston Cole Wagner with one count of Distribution of Child Pornography and one count of Receipt of Child Pornography, in violation of 18 U.S.C. § 2252A(a)(2).  (Doc. no. 1.)  Defendant moves to suppress statements he made to law enforcement on May 9, 2023, before receiving an advice of rights pursuant to Miranda v. Arizona, 384 U.S. 436, 444 (1966).  At the May 7, 2024 evidentiary hearing, the parties announced they had reached an agreement that at trial, the government will not use Exhibit 4 to docket number 47, which is the May 9, 2023 polygraph examination and statements Defendant made after the examination.  The parties also agreed the government will redact any reference to the polygraph examination from Exhibit 1 to docket number 47 prior to introducing that exhibit at trial.  As a result of their agreement, the parties stipulated that the portion of the motion to suppress regarding Exhibit 4 is moot.  (See doc. no. 60.)  Thus, the Court only considers, and makes its recommendation on, the remaining portion of the suppression motion regarding Defendant's statements to law enforcement as recorded in Exhibits 1 and 2 to docket number 47.

Having carefully considered all evidence and arguments, including the post-hearing briefing, (doc. nos. 65, 66), and in light of the stipulation described above, the Court **REPORTS** and **RECOMMENDS** the remainder of Defendant's motion to suppress be **DENIED**.  (Doc. no. 45.)

## I.     FACTS

On May 9, 2023, law enforcement officers stopped Defendant's vehicle on a dirt road leading to the residence he shared with his grandparents.  (Doc. no. 63-1, Def.'s Ex. 3, Interv'w Tr., pp. 2-3; doc. no. 64, Hr'g Tr., p. 44.)[1]  Defendant exited his vehicle, and after a search of his person pursuant to a federal search warrant, he entered the back seat of an unmarked, law enforcement minivan to speak with Homeland Security Investigations (HSI) Special Agent Hillary Nielsen, who was accompanied by Investigator Connelly with the Dodge County Sheriff's Office.  Hr'g Tr. 12; Interv'w Tr. 1.  At no time before or during his interaction with SA Nielsen in the van did Defendant receive an advice of <u>Miranda</u> rights.  Hr'g Tr. 54.

### A.     Initial Investigation Leads to Three Federal Search Warrants

The investigation into Defendant's alleged involvement in the distribution of imagery depicting child sexual exploitation via the internet began in January 2023 when HSI Task Force Officer (TFO) JB Reid in Charlotte, North Carolina determined imagery depicting child pornography, as defined by 18 U.S.C. § 2256, had been associated with Kik user

---

[1] Defense Exhibit 3 is an interview transcript created by defense counsel and stipulated as admissible by the government.  Hr'g Tr. 11.  During the hearing, the parties agreed the transcript is accurate and helpful but not certified by a court reporter.  <u>Id.</u> at 9-10.  The Court has carefully studied both the transcript and camera footage, and the government has agreed to shoulder the burden of pointing out in its objections any differences between the two that are material to the Report and Recommendation.  <u>Id.</u> at 11.

"blackphonix3532." In re Wagner, MJ 123-025, doc. no. 3, p. 14 (S.D. Ga. Apr. 28, 2023). The display name associated with "blackphonix3532" was "Slade Black," and undercover law enforcement determined "blackphonix3532/Slade Black" – was a member and group "admin" of the Kik group "Everything goes 2.0." Id. at 15. Undercover agents observed "Slade Black" ask users in the group if they wanted to "trade" and send multiple video files within the group, four of which were determined to depict child pornography. Id. at 15-16.

Upon service of a summons to Kik for subscriber information on the "blackphonix3532" account, law enforcement learned the email associated with the account was "austoncolewagner2@gmail.com." Id. at 17. Multiple IP addresses used to access the Kik account resolved back to a subscriber at 261 Sophia Drive, Eastman, Georgia, with a particular phone number. Id. at 17-18. A summons served on Google for information related to "austoncolewagner2@gmail.com" revealed a recovery email as "auston3532@gmail.com," a billing address for Google Pay as "Auston Wagner, 261 Sophia Drive, Eastman, Georgia 31023," and a specific phone number; the PayPal email was "auston3532@gmail.com." Id. at 18-19.

TFO Reid notified HSI Savannah about the undercover information collected, and SA Nielsen continued the investigation in the Southern District of Georgia. Upon reviewing the information described above, along with additional information from CyberTip reports, the National Center for Missing and Exploited Children, and further intelligence gathering, SA Nielsen sought and obtained three federal search warrants. Id. at 14-32. The warrants were for the residence at 261 Sophia Drive, Eastman, Georgia; a 2023 Dodge Challenger with a certain VIN number registered to Defendant and Russell Brown; and Defendant's person. MJ 123-025, doc. nos. 4, 8. SA Nielsen did not request an arrest warrant for Defendant.

HSI executed the three warrants on May 9, 2023.  Because of the multiple warrants, there were two teams for the operation:  one team to search the premises at the same time as the second team executed the warrants for Defendant's person and the vehicle he was driving home from work.  Hr'g Tr. 14.  There were more than ten but perhaps less than fifteen officers on scene for execution of the three warrants.  Id. at 45-46.  SA Nielsen was the team lead for the operation and interview of Defendant.  Id.

SA Nielsen drove her government vehicle to the search location.  Id. at 14.  The silver minivan is equipped with police lights inside but not visible from the outside that, along with a siren, can be activated from inside the vehicle.  Id. at 15.  The van does not have a PA system or a cage separating the front seat from the back bucket seats, and it is not marked as law enforcement on the outside.  Id.  No video or audio equipment is installed in the van to record conversations, and SA Nielsen set up a bifold camera on the dash facing the rear of the van to record the conversation with Defendant, with a red light on top to indicate whenever it is recording.  Id. at 15, 21-22, 47.  SA Nielsen testified no child safety locks were engaged while Defendant was in the van.  Id. at 47-48.

Execution of the warrants began when a local sheriff's deputy in a marked car conducted a traffic stop just short of the driveway to 261 Sophia Drive.  Ex. 7, 0:01-1:23.[2] After Defendant stepped out of his car, the deputy obtained Defendant's license and verified

---

[2]Although SA Nielsen was not wearing a body camera because her office is not issued such equipment, officers from other agencies that had been issued body cameras were wearing them in accordance with their local agency policies.  Hr'g Tr. 15-16.  Thus, the video exhibits at the evidentiary hearing were comprised of body camera footage and footage from the bifold camera on the dash inside the van.  These video clips will be cited as "Ex. _" throughout this document and, as necessary, will reference the time stamp as displayed by the counter at the bottom of the screen.

his identity.  Id.  Defendant was not handcuffed or arrested when he exited the vehicle, and upon initial approach, SA Nielsen asked Defendant if he wanted to step around back for a second, to which Defendant responded, "Sure."  Ex. 10, 2:12-:14.[3]  SA Nielsen explained the purpose of asking Defendant to step back to the van was to execute the search warrant of his person and give him the opportunity for an interview.  Hr'g Tr. 18.  SA Nielsen had her hand around Defendant's arm for approximately five seconds and then at the middle of his back for approximately five more seconds to direct him back toward the van.  Id. at 18, 44; Ex. 10, 2:16-:25.  SA Nielsen explained she directed Defendant toward the van and away from the road where a second caravan of officers would soon be driving by to search the residence. Hr'g Tr. 18-19, 44.

Defendant was not handcuffed or otherwise restrained as he and SA Nielsen moved away from Defendant's car toward the van.  Ex. 10.  Once they reached the van, SA Nielsen executed the search of Defendant's person, which revealed employment identification cards but no electronic devices.  Hr'g Tr. 19-20.  Defendant was not free to leave during the search of his person.  Id. at 46-47.  After the search but before entering the van, Defendant was not informed he was released from the search of his person  Id. at 46, 48.

Prior to stepping into the van, no one told Defendant he was under arrest or being taken into custody.  Id. at 20.  SA Nielsen did not tell Defendant he was required to get into the van,

---

[3]The government submitted various body camera clips showing different angles of Defendant's interaction with law enforcement officers prior to entering the van, (Exs. 7, 8, 9), which were then combined into one, composite Exhibit 10.  Hr'g Tr. 17.

and although she was armed and wearing tactical gear, as was Inv. Connelly, neither she nor any other officer drew a weapon on Defendant.  Id. at 48, 58; Exs. 1-A,[4] 10.

### B.      Interview in Back of Van

Defendant stepped into the back of the van under his own power at approximately ten minutes before 8:00 a.m., and SA Nielsen waited to enter the back of the van until Inv. Connelly had entered the front passenger seat.  Interv'w Tr. 1; Ex. 1-A.  In response to Defendant's statement that he was "so confused," (Interv'w Tr. 1), SA Nielsen explained who she was, as well as introduced Inv. Connelly.  Id.; Ex. 1-O.  Defendant sat in the rear, driver's side bucket seat, while SA Nielsen sat in the passenger's side rear seat and Inv. Connelly sat in the passenger's front seat; Defendant's ability to exit the van on the driver's side was not blocked by either officer, and the sliding door next to him was not locked.   Hr'g Tr. 33; Exs. 1-O, 1-P.  SA Nielsen was aware prior to May 9th, that Defendant would be returning home from a twelve-hour work shift at the time the execution of the warrants began.  Hr'g Tr. 53-54.  Defendant also confirmed during the interview that his overnight shift, which he had just completed, usually began at 6:00 p.m. and generally lasted twelve to fourteen hours.  Interv'w Tr. 38.

SA Nielsen started by collecting Defendant's identification information, including address, phone number, email accounts, and employment information.  Hr'g Tr. 22-23; Interv'w Tr. 8; Ex. 1-O.  SA Nielsen worked to build rapport with Defendant, asking about his employment and Basic Correctional Officer Training (BCOT) in a calm, kind, and conversational manner.  Hr'g Tr. 48; Interv'w Tr. 8-13; Ex. 1-P.  After hearing about

---

[4]At the hearing, the government submitted the complete recording of the interview in the back of the van as Exhibits 1 and 2.  The government introduced smaller clips as separate exhibits.

Defendant's BCOT training, law enforcement employment aspirations, and day-to-day work as a correctional officer, SA Nielsen unequivocally informed Defendant, "You're not under arrest or anything.  We're just having a conversation.  So you can tell me to pound sand if you want to, but I just want to be super clear.  I'm not forcing you to talk to me."  Defendant replied, "Sure."  Interv'w Tr. 14; Ex. 1-B.  This disclaimer occurred at approximately five minutes after 8:00 or about one-half hour past the initiation of the traffic stop.  Hr'g Tr. 25.  Up to this point, there had been no discussion as to whether Defendant had violated any laws.  Id.

The interview continued with SA Nielsen inquiring about Defendant's phone, other electronic devices, and internet usage.  Interv'w Tr. 18-27.  Defendant stated he was sure there would be no pictures or videos of "kids' sex stuff" on his phone if SA Nielsen were to look, but he declined permission for her to do so, explaining there were nude pictures of him and his girlfriend.  Id. at 31-32; Hr'g Tr. 25; Ex. 1-C.  Defendant did, however, consent to a limited search of his Google email accounts, specifically excluding Google Photos, which would have also contained nude pictures of him and his girlfriend.  Hr'g Tr. 26-28; Interv'w Tr. 41-45; Ex. 1-D; Gov't Ex. 3.  The consent form stated:

> I provide this written consent freely and voluntarily, without fear, threats, coercion, or promises of any kind.  I understand that I have the right to refuse to provide this consent, and I voluntarily waive that right.  I understand that I may withdraw this consent at any time by providing written notification to the HSI official listed below, or another official associated with the investigation. However, I also understand that all information obtained or examined by HSI may be lawfully seized and used as evidence.

Gov't Ex. 3.  SA Nielsen also verbally reviewed the consent form with Defendant, explaining he is consenting to have agents go through his email accounts, excepting Google Photos, and that she did not "bully [him] or force [him] into it or anything like that."  Interv'w Tr. 45; Exs.

1-D, 1-E.  Approximately one hour and nine minutes elapsed from commencement of the interview until Defendant gave limited consent to search email.  Hr'g Tr. 29.

After Defendant signed the consent form, SA Nielsen suggested taking a break so that she could drive the van up to the residence to locate a computer for agents to use to review the Google email.  Hr'g Tr. 28-29; Interv'w Tr. 45; Exs. 1-F, 1-H.  Defendant agreed.  Hr'g Tr. 29; Interv'w Tr. 45; Ex. 1-H.  At the time, the van was parked on the dirt road leading to the driveway of the residence to be searched at 261 Sophia Drive.  Hr'g Tr. 28-29.  SA Nielsen exited the back passenger side of the van, asked Inv. Connelly to take her place in the back, and entered the driver's seat.  Hr'g Tr. 49; Interv'w Tr. 45.  To transport individuals, HSI policy requires two officers or agents in the vehicle, and as a matter of safety, because Defendant was sitting directly behind SA Nielsen, another person needed to be in the back seat area with Defendant.  Hr'g Tr. 58-59.

During the approximate one-minute drive to the residence, SA Nielsen asked if Defendant needed "water or anything like that," which Defendant declined.  Hr'g Tr. 31; Interv'w Tr. 46-47.  SA Nielsen left Inv. Connelly with Defendant while she went inside to check with the premises search warrant team on the progress of the search, including whether evidence had been seized or devices forensically processed, and to update them with any information she had learned from Defendant.  Hr'g Tr. 31-32.  SA Nielsen identified three reasons she left Defendant with Inv. Connelly during the break:  (1) to make sure someone was available to meet or communicate a need that might arise for Defendant; (2) the van was running, and such government equipment could not be left unattended; and (3) part of the operational plan for executing the three search warrants included having a law enforcement official with anyone identified on scene for the duration of the search for the protection of

8

officers, as well as protection and security of evidence.  Id. at 32-33.

SA Nielsen did not place any restrictions on Defendant's actions or movements before she left the van, and the van remained unlocked, as it had throughout the interview.  Hr'g Tr. 33.  Up to this point of the interview, Defendant never asked to leave the van.  Id.  Nor had he admitted to any involvement in child pornography.  Id.  At the time of the break, the entire police encounter, starting with the initial traffic stop, had lasted approximately one and a half hours, with the interview taking up approximately one hour and ten minutes.  Id.

When SA Nielsen left the van, Defendant asked Inv. Connelly, "Why do y'all keep me in here?"  Interv'w Tr. 48.  After Inv. Connelly asked for clarification, Defendant asked again, "Why do y'all keep me in the car?" to which Inv. Connelly responded, "That's up to her.  Yeah. I'm just here."  Id.  After discussing work schedules, and Inv. Connelly's early start to his normal schedule, Defendant stated, "Sh*t.  Normally I'm going to sleep by now."  Id.  Inv. Connelly replied, "Kick back, take a nap.  I don't know how long they going to be."  Id. at 49. Although Defendant had been observed sporadically rubbing his eyes, brushing his hair from his face, and leaning his head back against the bucket seat, (Hr'g Tr. 48, 50), Defendant did not take advantage of the offer for a nap at any time during the nearly fifty minutes SA Nielsen was in the residence.

Upon her return to the van parked in front of Defendant's residence, SA Nielsen again asked Defendant how he was doing and if he needed anything.  Hr'g Tr. 34; Interv'w Tr. 50; Ex. 1-I.  He stated he was "doing all right" and did not need anything.  Hr'g Tr. 34; Interv'w Tr. 50.  SA Nielsen elected to share more information with Defendant about the investigation and the evidence.  Hr'g Tr. 34; Interv'w Tr. 52.  She reminded Defendant he did not have to speak with her and that she told him at the start of their interview he was not under arrest.  Hr'g

Tr. 35; Interv'w Tr. 53.

Within fifteen minutes of this reminder, Defendant admitted to accessing and distributing child pornography online. Hr'g Tr. 35. In response to SA Nielsen's appeal to Defendant's honesty, maturity, and leadership skills, (Interv'w Tr. 55), Defendant gave a coherent, detailed description of his involvement in the activities forming the basis for his current federal charges. Id. at 57-89. SA Nielsen summarized the information as follows: "He says that he used the internet to search for and access child pornography, that he sent and received child pornography within online chat groups, and that he acted as an administrator for one of those chat groups." Hr'g Tr. 36.

Prior to this confession, Defendant never asked for a lawyer or indicated he wished to quit speaking with SA Nielsen or leave the van. Id. SA Nielsen never promised Defendant anything in exchange for his confession. Id. She never yelled, raised her voice, or made any threats. On the contrary, SA Nielsen was, according to her own description, unfailingly "cordial, comfortable, professional," (id. at 37), to the point of what defense counsel described as "buttering-up" kindness. Id. at 48. There is no dispute that prior to the confession, SA Nielsen told Defendant he was not under arrest and did not have to speak with her, but she never specifically told him he was free to leave. Id. at 54. Nor did she read Defendant his Miranda rights. Id.

Once Defendant admitted to his involvement with child pornography, SA Nielsen's next concern focused on whether he had committed any hands-on sexual abuse acts against children. Id. at 37. SA Nielsen asked Defendant if he had ever had sexual contact with a child under the age of eighteen and offered him the opportunity to take a polygraph test at the Dodge County Sheriff's Office to prove his denial. Id. at 38; Interv'w Tr. 87-88. Defendant accepted

the offer of taking a polygraph test, and SA Nielsen offered to let Defendant drive himself if execution of the vehicle search warrant was complete, or she and Inv. Connelly would give him a ride: "I don't have any preference." Interv'w Tr. 88-89; Hr'g Tr. 38. SA Nielsen never determined whether the search team was finished with the vehicle or told Defendant his car was free for him to drive because Defendant said he wanted a ride to the Sheriff's Office. Hr'g Tr. 55. Prior to leaving for the polygraph, SA Nielsen took a short break to check on the progress of the search of the residence; she again asked Defendant if he wanted any food or water, but he declined. Id. at 39; Interv'w Tr. 54-55; Ex. 1-L.

Upon her return, SA Nielsen and Defendant had a brief conversation to clarify some device use and account information, and then she provided the requested ride to the Sheriff's Office. Hr'g Tr. 39-40; Interv'w Tr. 90; Ex. 1-M. From the time the interview in the back of the van began until the time the ride to the Sheriff's Office commenced, slightly less than four hours had elapsed, (Hr'g Tr. 52), and SA Nielsen was absent from the van for at least fifty minutes of that time. Id. at 34. SA Nielsen found Defendant's conversation with her to be coherent and logical. Id. at 41. During the ride to the Sheriff's Office, SA Nielsen asked Defendant if he would have preferred to speak with her somewhere other than in the van, perhaps sitting "on the back porch or something," and he responded the van was "all right." Id.; Interv'w Tr. 96; Ex. 1-N.

Given the parties' stipulation regarding the polygraph, (see doc. no. 60), the Court need not recount the facts of that interview. After the polygraph, Defendant was arrested on state charges that were unrelated to child pornography. Hr'g Tr. 59. The federal grand jury did not indict Defendant until June 7, 2023, (doc. no. 1), and a federal arrest warrant was issued on June 8, 2023, (doc. no. 4).

## II.    DISCUSSION

Defendant argues for suppression of his statements made in the back of the van because he was in custody but never Mirandized.  (See doc. nos. 45, 55, 65.)  The government contends an advisement of Miranda rights was not required at that time because Defendant was not in custody.  (See doc. no. 47, 66.)  After carefully considering the arguments, the Court finds no basis for suppression.

### A.    Legal Framework for Custody Determination

"No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."  U.S. Const. amend. V.  "To give force to the Constitution's protection against compelled self-incrimination, the Court established in Miranda, 'certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation.'"  Florida v. Powell, 559 U.S. 50, 59 (2010) (citation omitted).  Prior to conducting a custodial interrogation, law enforcement officers must warn the interview subject that he has a "right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed."  Miranda, 384 U.S. at 444.  Failure to give the requisite warnings before custodial questioning "requires trial courts to 'exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel.'"  United States v. Woodson, 30 F.4th 1295, 1303 (11th Cir. 2022) (citing United States v. Luna-Encinas, 603 F.3d 876, 880 (11th Cir. 2010)).

However, the concept of custody in the Miranda context is a "term of art" specifying "circumstances that are thought generally to present a serious danger of coercion."  Howes v. Fields, 565 U.S. 499, 508-09 (2012).  A coercive environment exists "when a reasonable

person would have understood that his freedom of action was 'curtailed to a degree associated with formal arrest.'"  Woodson, 30 F.4th at 1303 (citation omitted).  Stated otherwise, when analyzing whether Miranda warnings are required, the Court must decide whether "under the totality of the circumstances, a reasonable man in the suspect's position would feel a restraint on his freedom of movement fairly characterized as that degree associated with a formal arrest to such extent that he would not feel free to leave."  United States v. Paige, 241 F. App'x 620, 622 (11th Cir. 2007) (per curiam) (citing United States v. Phillips, 812 F.2d 1355, 1360 (11th Cir. 1987)).

However, "the freedom-of-movement test identifies only a necessary and not sufficient condition for Miranda custody."  Woodson, 30 F.4th at 1303.  That is, a seizure does not necessarily equate to custody for Miranda purposes.  United States v. Street, 472 F.3d 1298, 1309-10 (11th Cir. 2006).  "[A]lthough a reasonable person in the defendant's position may feel constrained not to leave the scene of a police encounter at a particular moment—and thus may be deemed to have been 'seized' by law enforcement—he will not necessarily be considered in 'custody' for Fifth Amendment purposes."  Luna-Encinas, 603 F.3d at 881 (citation omitted); Woodson, 30 F.4th at 1303 ("Restriction on movement is not always enough.").  Thus, the Court must also consider whether the circumstances of an interview exhibit "the shock that very often accompanies arrest" and can create pressure to speak in the "hope that, after doing so, he will be allowed to leave and go home."  Woodson, 30 F.4th at 1303.  Accordingly, the Court must consider "the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in Miranda."  Howes, 565 U.S. at 509.

The evaluation of a coercive environment is undertaken in two steps:

The first goes more to nature and the second more to degree.  We first ask whether "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave."  To answer that question, we examine "all of the circumstances surrounding the interrogation," including the location and duration of the questioning, statements made during the interview, the presence or absence of physical restraints, and whether the person was released after the interview.

Woodson, 30 F.4th at 1303; see also United States v. Muegge, 225 F.3d 1267, 1270 (11th Cir. 2000) (per curiam) (explaining an individual's "status as a suspect, and the 'coercive environment' that exists in virtually every interview by a police officer of a crime suspect, [does] not automatically create a custodial situation" (citation omitted)).  This non-exhaustive list of factors also includes whether officers informed the suspect he was free to leave and not in custody, brandished weapons, touched the suspect, indicated compliance could be compelled, gave breaks during the interview, or ignored the suspect's requests for an attorney. See Luna-Encinas, 603 F.3d at 881; Street, 472 F.3d at 1309; United States v. Moya, 74 F.3d 1117, 1119 (11th Cir. 1996).

The determination of custody is based on an objective standard:  "whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'"  Howes, 565 U.S. at 509. Because the test is objective, contemplating the perspective of a reasonable innocent person, "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant."  Woodson, 30 F.4th at 1304 (citation omitted); see also Moya, 74 F.3d at 1119 (explaining objective standard contemplates reasonable innocent person and therefore "[w]hether a defendant knows he is guilty and believes incriminating evidence will soon be discovered is irrelevant").  In sum, "[o]nce the scene is set and the

players' lines and actions are reconstructed, the court must apply an objective test to resolve the ultimate inquiry:  [was] there a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest."  Thompson v. Keohane, 516 U.S. 99, 112 (1995) (internal quotation marks and citations omitted).  Finally, Defendant bears the burden of establishing he was in custody.  Woodson, 30 F.4th at 1302; United States v. de la Fuente, 548 F.2d 528, 533 (5th Cir. 1977).[5]

**B.**   **Miranda Warnings Were Not Required Because Defendant Was Not In Custody When He Spoke to SA Nielsen**

Having carefully considered the evidence in light of the legal framework, the Court finds Defendant was not in custody at the time of the interview in the back of the van.  First, prior to discussing any topic that could be incriminating, SA Nielsen unequivocally told Defendant he was not under arrest and not required to talk to her.[6]  Hr'g Tr. 25; Interv'w Tr. 14.  While SA Nielsen never told Defendant he was free to leave, this fact is not dispositive and, instead, only one of many factors to consider.  United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006); Howes, 565 U.S. at 509; United States v. Matcovich, 522 F. App'x 850, 851 (11th Cir. 2013) (*per curiam*).

---

[5]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (*en banc*), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

[6]The Court credits the testimony of SA Nielsen.  See United States v. Williams, 731 F.3d 1222, 1230 (11th Cir. 2013) (recognizing that credibility determinations are within the province of the fact finder and will be upheld "unless [the Court's] understanding of the facts appears to be unbelievable" (citation omitted)).  She was calm and consistent throughout her testimony, including when pressed by defense counsel during a vigorous cross-examination to explain her actions.  The video exhibits also support SA Nielsen's description of events.

Indeed, even if a defendant is not told he is free to leave, "informing an individual that he is 'not under arrest' and that the proposed conversation is voluntary is also 'powerful evidence' that he is not in custody." Woodson, 30 F.4th at 1304-05 (citations omitted); see also United States v. Ware, No. CR 122-019, 2023 WL 2922839, at *6 (S.D. Ga. Mar. 3, 2023) ("While the officers never uttered the phrase 'free to leave,' this omission is not dispositive of the custody analysis, and courts often find no custody where, as here, a host of other facts show the restraint on freedom never approached the degree associated with formal arrest." (collecting cases in support)), *adopted by* 2023 WL 2918755 (S.D. Ga. Apr. 12, 2023).  Here, SA Nielsen twice informed Defendant prior to his confession he was not under arrest and did not have to speak with her.  Hr'g Tr. 25, 35; Interv'w Tr. 14, 53; Ex. 1-B.

Second, SA Nielsen's tone and demeanor were calm, cordial, comfortable, and professional, and she never yelled, raised her voice, or threatened Defendant, or promised him anything in exchange for his confession.  Hr'g Tr. 36-37.  As shown in the video exhibits, there was no intimidation, aggression, threats, or raised voices from SA Nielsen or Inv. Connelly. While the officers on scene were armed, including SA Nielsen and Inv. Connelly, no officer brandished a weapon in Defendant's direction.  Hr'g Tr. 48, 58; Exs. 1-A, 10.  Although Defendant argues he was "penned in" as he sat in the van, (Hr'g Tr. 47), he sat next to the unblocked and unlocked sliding door of the van.  Hr'g Tr. 33; Exs. 1-O, 1-P.  Moreover, while in this seating arrangement, Defendant refused consent to search his phone, and when granting limited consent to search his email accounts, reviewed and signed a consent form specifically delineating that he "freely and voluntarily" gave consent – and had the right to refuse consent. Gov't Ex. 3.  Also, the unmarked van did not have visible outside police lights, a PA system,

or a cage separating the front from the back seats, and the doors were unlocked throughout the interview.  Hr'g Tr. 15.

Defendant was not handcuffed, and Defendant never asked for a lawyer or stated he wished to quit speaking with SA Nielsen or leave the van.  When SA Nielsen was absent from the van during a fifty-minute break, Defendant asked Inv. Connelly, "Why do y'all keep me in here?" to which Inv. Connelly responded, "That's up to her.  Yeah.  I'm just here."  Interv'w Tr. 48.  Defendant argues this comment shows he did not believe he was free to leave.  (Doc. no. 65, p. 5.)  But the test is objective; Defendant's subjective beliefs about whether he was free to leave are irrelevant.  See Stansbury v California, 511 U.S. 318, 323-24 (1994); Moya, 74 F.3d at 1119; see also J.D.B. v. North Carolina, 564 U.S. 261, 271 (2011) ("By limiting analysis to the objective circumstances of the interrogation, and asking how a reasonable person in the suspect's position would understand his freedom to terminate questioning and leave, the objective test avoids burdening police with the task of anticipating the idiosyncrasies of every individual suspect and divining how those particular traits affect each person's subjective state of mind." (citations omitted)).  Any reasonable person would have realized he was free to leave because SA Nielsen explicitly advised Defendant he was not under arrest and did not have to speak with her.  Importantly, Defendant did not ask SA Nielsen to leave upon her return to the van or at any time during the interview.

Third, the interview did not last an unduly long time.  The entire interaction with law enforcement, including breaks totaling slightly more than fifty minutes, lasted less than four hours.  Hr'g Tr. 34, 52; Interv'w Tr. 47.  SA Nielsen took the first break after approximately one hour and ten minutes of conversation with Defendant.  Hr'g Tr. 33.  After returning from a break of about fifty minutes, Defendant made his first incriminating statement within fifteen

minutes, well short of three hours into the encounter.  The law is well-settled that interviews lasting as long as four hours do not constitute custody requiring <u>Miranda</u> warnings.  <u>See Woodson</u>, 30 F.4th at 1306-07 (recognizing Eleventh Circuit precedent dating to 2001 had decided interviews ranging from two and a half to approximately four hours were non-custodial); <u>United States v. Peck</u>, 17 F.Supp.3d 1345, 1361-62 (N.D. Ga. 2014) (collecting cases where interviews lasting from one to four hours did not constitute custody for <u>Miranda</u> purposes); <u>United States v. Miller</u>, Crim. Case No. 2:15-cr-14, 2015 WL 13238641, at *5 (S.D. Ga. Oct. 30, 2015) (collecting cases ranging from one and a half to four-hour interrogations where <u>Miranda</u> warnings not required), *adopted by* 2015 WL 8578649 (S.D. Ga. Dec. 9, 2015); <u>see also</u> <u>United States v. Blocker</u>, Crim. Act. No. 1:14-cr-228, 2016 WL 3281018, at *18 (N.D. Ga. Feb. 29, 2016) (finding possible four hour questioning not sufficient to render questioning custodial), *adopted by* 2016 WL 3259096 (N.D. Ga. June 14, 2016).

Fourth, Defendant's movement was not restricted during the encounter with SA Nielsen in a manner presenting "the same inherently coercive pressures as the type of station house questioning at issue in <u>Miranda</u>." <u>Howes</u>, 565 U.S. at 509.  After Defendant first stepped out of his vehicle for the initial traffic stop, he was not handcuffed or arrested.  When SA Nielsen asked if Defendant wanted to step back to the van, he said, "Sure." Ex. 10, 2:12-:14.  While SA Nielsen did guide Defendant away from the road and to her van by placing her hand on his arm and on his back for ten seconds, such guidance comes nowhere close to the level of restraint associated with a formal arrest.

Consistent with safety protocols for executing the search warrants, a law enforcement officer remained with Defendant during the entirety of the search to ensure officer safety and

preservation of evidence.[7] Hr'g Tr. 32-33.  Such a routine precaution incident to execution of a search warrant does not tip the totality of the circumstances in favor of custody.  Brown, 441 F.3d at 1348-49 (affirming denial of motion to suppress where, "[a]lthough an officer accompanied [the defendant] throughout the house for safety reasons, he was free to eat, smoke, use the phone, and move about as he wished");  United States v. Opoku, 210 F. App'x 848, 852 (11th Cir. 2006) (per curiam) (finding safety precaution of assigning agent to "follow and continuously watch" defendant during interview did not amount to custodial interrogation requiring Miranda warnings).

The search of Defendant's person, as authorized by a search warrant, does not weigh in favor of a finding of custody.  See Michigan v. Summers, 452 U.S. 692, 702-03 (1981) (explaining multiple, legitimate law enforcement interests in detention during execution of search warrant); see also United States v. Asher, Crim. Indict. No. 1:09-CR-414, 2010 WL 4192883, at *8 -*12 (N.D. Ga. Feb. 25, 2010) (citing Summers for proposition that authority to detain during execution of search warrant does not equate to custody for Miranda purposes or alter totality of circumstances analysis), adopted by 2010 WL 4237579 (N.D. Ga. Oct. 21, 2010).  Defendant did not make any incriminating statements during the search of his person, and SA Nielsen explicitly informed Defendant after the search and his entry into the van that he was not under arrest and did not have to talk.

---

[7]The location of the traffic stop can be reasonably considered part of the search scene because the dirt road led directly to the residence.  When local law enforcement initiated the traffic stop, Defendant expressed his surprise at being stopped "on our own dirt road." Ex. 10.  Moreover, officers were searching Defendant's vehicle pursuant to the federal warrant approximately two car lengths forward of the van. Id.

Similarly, the Court rejects any implied argument that the total number of officers involved in the two search teams, (Hr'g Tr. 45; doc. no. 65, p. 4), automatically created a "coercive environment" requiring <u>Miranda</u> warnings.  That is, a non-custodial situation is not converted to a custodial one simply because a certain number of personnel are required on scene to carry out their law enforcement duties.  See <u>United States v. Varnell</u>, Crim Indict. No. 1:13-CR-394, 2014 WL 5517923, at *3, *7-8 (N.D. Ga. Oct. 28, 2014) (finding no custody where team of approximately twelve, including federal agents dressed in tactical gear, arrived between 6:00 and 7:00 a.m. to execute search warrant for residence); <u>United States v. Graham</u>, Crim. Act. File No. 3:13-CR-11, 2014 WL 2922388, at *3, *6-7 (N.D. Ga. June 27, 2014) (no custody where fifteen agents arrived at residence at approximately 6:20 a.m. to execute search warrant, entered in a single-file line, referred to as "stack," with guns drawn while yelling, "Police.  Search Warrant").  Moreover, "the emphasis is rightly placed on the environment surrounding the interview itself." <u>Woodson</u>, 30 F.4th at 1305.  While between ten to fifteen officers were involved in execution of the three search warrants, only SA Nielsen and Inv. Connelly were present for the interview.

Defendant contends his movement was restricted because the team was searching his automobile, and SA Nielsen's offer to let Defendant drive himself to the Sheriff's Office for the polygraph exam was misleading because the car could not leave the scene until the search had been completed.  Hr'g Tr. 46-47; doc. no. 65, p. 2.  The record does not reveal whether the search of the car had been completed at the time of SA Nielsen's offer because Defendant accepted the ride to the Sheriff's Office immediately and without asking the status of the car search.  In any event, a defendant is free to leave so long as any method of departure is available, including walking.  See <u>Brown</u>, 441 F.3d at 1349 (recognizing means for leaving

such as going outside barefoot, wearing someone else's shoes, or walking a short distance to someone else's car are options, "albeit imperfect ones," for leaving a non-custodial interview). Defendant could have always walked the short distance from the traffic stop to the residence. When given the choice to drive himself to the Sheriff's Office, he was free to make any number of alternate transportation arrangements.[8]  He willingly chose not to pursue those options and, instead, to ride with SA Nielsen and Inv. Connelly.

Finally, Defendant "did not experience the 'sharp and ominous change' of circumstances associated with custody under <u>Miranda</u>," such as being "'yanked from familiar surroundings in the outside world and subjected to interrogation in a police station' or another 'police dominated atmosphere.'"  <u>Woodson</u>, 30 F.4th at 1306 (citation omitted).  Defendant was on the dirt road leading directly to his residence, and the base of Defendant's driveway was visible from the location where the interview commenced.  Hr'g Tr. 28-29.  Once SA Nielsen drove less than one minute up that dirt road, the van was parked in front of Defendant's residence.  <u>Id.</u> at 34.  "[C]ourts are *much* less *likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home."  <u>United States v. Gomes</u>, 279 F. App'x 861, 868 (11th Cir. 2008) (*per curiam*) (citing <u>Brown</u>, 441 F.3d at 1348); <u>see also Woodson</u>, 30 F.4th at 1306 (remaining right outside home and only steps away from family during questioning cuts against finding of custody).  When asked if he would have preferred to talk on his own back porch instead of in the van, Defendant said, "Not really."  Hr'g Tr. 41; Interv'w Tr. 96.  Defendant was interviewed in the back of an

---

[8]Indeed, SA Nielsen had discussed walking to the residence just prior to taking the fifty-minute break.  Interv'w Tr. 46.

unlocked van on the property where he lived, within sight of his residence. The familiar setting also cuts against a finding Defendant was in custody.

The Court recognizes Defendant's argument that <u>Miranda</u> warnings were required because SA Nielsen was attempting to elicit incriminating information from him. (Doc. no. 65, p. 3.) However, because the Court finds Defendant was not in custody at the time of his interview with SA Nielsen, the decision in <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301 (1980), does not apply. The defendant in <u>Innis</u> had been arrested, advised of his <u>Miranda</u> rights, and requested to speak with counsel. <u>Id.</u> at 293-94. The issue was whether the defendant had been improperly interrogated *after* being taken into custody. <u>Id.</u> at 300. Here, as explained above, the Court concludes Defendant was not in custody when he spoke with SA Nielsen in the van.

For these reasons, and having considered the totality of the circumstances, the Court finds Defendant has not met his burden, <u>see</u> <u>Woodson</u>, 30 F.4th at 1302, to show he was in custody when he made his statements to SA Nielsen. Nor was he "subjected to coercive pressures fitting the archetype of <u>Miranda</u> questioning." <u>Id.</u> at 1307. Thus, <u>Miranda</u> warnings were not required.

### C.    Voluntariness

Turning to the voluntariness inquiry, the Court must ultimately determine whether a statement was made freely or "whether the defendant's 'will has been overborne and his capacity to self-determination critically impaired.'" <u>Devier v. Zant</u>, 3 F.3d 1445, 1455-56 (11th Cir. 1993) (citation omitted). In <u>Jackson v. Denno</u>, 378 U.S. 368, 376 (1964), the Supreme Court explained that a defendant is deprived of Due Process if he is convicted, based in any part, on an involuntary confession. Regardless of whether an advisement of <u>Miranda</u> rights is required, "the court must still rule on the confession's voluntariness." <u>Jarrell v.</u>

Balkcom, 735 F.2d 1242, 1251-52 (11th Cir. 1984); United States v. Lall, 607 F.3d 1277, 1285 (11th Cir. 2010) (explaining court must still address the voluntariness of confession, even if no Miranda warnings were required because defendant was not "in custody in the technical sense").  The government must show, by a preponderance of the evidence, that Defendant's confession was voluntary.  Lego v. Twomey, 404 U.S. 477, 489 (1972); United States v. Bernal-Benitez, 594 F.3d 1303, 1318 (11th Cir. 2010).

The voluntariness inquiry focuses on "whether the defendant was coerced by the government into making the statement."  United States v. Thompson, 422 F.3d 1285, 1295 (11th Cir. 2005).  Coercion may be mental or physical, Blackburn v. Alabama, 361 U.S. 199, 206 (1960), and "'[s]ufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession.'"  Thompson, 422 F.3d at 1295-96.  The Court must consider the totality of circumstances to determine "whether police conduct was 'causally related' to the confession"; that is, was the defendant's statement "the product of a free and deliberated choice rather than intimidation, coercion or deception."  Id. (citations omitted).  This totality of the circumstances inquiry includes consideration of (1) details of the interrogation; (2) the defendant's education, intelligence, and other characteristics; (3) length of detention; (4) questioning that is repetitious or prolonged; (5) physical punishment such as the deprivation of food or sleep; and (6) any promises to induce a confession.  See United States v. Ransfer, 749 F.3d 914, 935 (11th Cir. 2014); Colorado v. Connelly, 479 U.S. 157, 163 n.1 (1986); United States v. Bernal–Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010); Waldrop v. Jones, 77 F.3d 1308, 1316 (11th Cir. 1996).

Here, considering the totality of the circumstances, the Court finds Defendant's statements to SA Nielsen were voluntary and the product of a free and deliberate choice, made in the absence of intimidation, coercion, and deception.  As discussed in detail above, SA Nielsen's tone and demeanor throughout the interview were kind and professional; she never yelled at or threatened Defendant, or promised Defendant anything in exchange for his confession.  He was advised his participation in the conversation was voluntary and he was not under arrest.  There was no intimidation, aggression, or raised voices from SA Nielsen or Inv. Connelly.  Defendant never asked for a lawyer or stated he wished to quit speaking with SA Nielsen or leave the van.  Defendant's conversation with SA Nielsen revealed him to be coherent, detailed and logical.  Nor did the interview last an unduly long time.  Likewise, the consent to search form explicitly stated Defendant's consent was given freely and voluntarily, and Defendant understood he had the right to refuse consent.  Gov't Ex. 3.

The main point to which Defendant stakes his claim on voluntariness is that he had just finished an overnight work shift of at least twelve hours as a correctional officer at the time of the traffic stop and interview.  According to Defendant, because he had been awake since 4:00 the prior afternoon, an interview starting just before 8:00 a.m. the next day and lasting less than four hours amounts to improper coercion.  The Court disagrees.

During the interview, SA Nielsen offered Defendant water and food on more than one occasion.  Hr'g Tr. 31, 34; Interv'w Tr. 46-47, 50.  Defendant repeatedly declined.  Id.  SA Nielsen did know Defendant would be returning from a twelve hour shift, and Defendant did tell Inv. Connelly he would normally be asleep by that time (about an hour after the interview started).  Interv'w Tr. 48.  Notably, Inv. Connelly offered, "Kick back, take a nap."  Interv'w Tr. 49.  Despite Defendant attributing a rub of the eye or a brush of the hair away from his face

as proof of exhaustion, (Hr'g Tr. 48, 50), when offered the chance for sleep during a fifty-minute break, he declined.  Moreover, Defendant described his typical day when he worked a twelve to thirteen-hour shift as staying up for about an hour once he got home and then going to sleep.  Interv'w Tr. 38.  Thus, even if Defendant had been awake slightly longer than his normal schedule, the length of time - particularly having been offered a nap - does not equate to a deprivation amounting to physical punishment that would constitute coercion to obtain a confession.

Moreover, the Court notes that although the parties have a stipulation regarding the polygraph test, it was originally challenged, and an unofficial transcript of that proceeding was submitted.  In that transcript, Defendant notified SA Nielsen when he was tired, hungry, thirsty, and did not want to proceed.  (Doc. no. 56, p. 118.)  Although not dispositive of the issue now before the Court, it is suggestive that once Defendant needed something, be it sleep, food, or water, he knew how to ask for it.  He made no such request during the interview in the van.

Thus, upon consideration of the totality of the circumstances, and including a specific finding officers did not deprive Defendant of sleep in such a way his "'will has been overborne and his capacity to self-determination critically impaired,'"  Devier, 3 F.3d at 1455-56, the Court finds the government has demonstrated by a preponderance of the evidence Defendant's statements provided without Miranda warnings were voluntary.  See Lego, 404 U.S. at 489; Bernal-Benitez, 594 F.3d at 1318.

## III.   CONCLUSION

For the reasons set forth above, and in consideration of the parties' stipulation regarding the polygraph examination of Defendant and statements he made after the examination which renders that portion of Defendant's challenge moot, (see doc. no. 60), the Court **REPORTS**

and **RECOMMENDS** the remainder of Defendant's motion to suppress be **DENIED**.  (Doc. no. 45.)

SO REPORTED and RECOMMENDED this 24th day of June, 2024, at Augusta, Georgia.

BRIAN K. EPPS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF GEORGIA